[Civ. No. 34929. First Dist., Div. Two. Apr. 12, 1976.]

JIMMIE TRAMMELL, Plaintiff and Appellant, v.
WESTERN UNION TELEGRAPH COMPANY,
Defendant and Appellant.

**COUNSEL**

Nichols, Williams, Morgan & Digardi and J. Michael Brown for Plaintiff and Appellant.

Donahue, Gallagher, Thomas & Woods, John F. Kraetzer and Gary J. Hill for Defendant and Appellant.

**OPINION**

**BRAY, J.**\*—Appellant Jimmie Trammell appeals from a judgment of the Alameda County Superior Court after jury verdict notwithstanding

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

the verdict as to the punitive damages. Also the Western Union Telegraph Company appeals from the judgment against it.

## Issues Presented

1. Western Union's liability was limited to $500.

2. The judgment notwithstanding the verdict was properly granted.

## Record

Plaintiff filed a complaint against defendant the Western Union Telegraph Company (hereinafter "Western Union") alleging that plaintiff was an employee of Marwais Steel Company (hereinafter "Marwais Steel") who would from time to time be laid off from his said employment to be recalled to work on the basis of seniority; and that on May 5, 1971, Marwais Steel delivered to Western Union a message regarding his return to work to be delivered to plaintiff. The complaint further alleged that Western Union so negligently and carelessly transmitted and delivered said telegraph message as to cause it to be delivered to someone other than plaintiff; and that as a result of defendant's carelessness and negligence, plaintiff was deprived of his employment with Marwais Steel.

In a second cause of action, plaintiff alleged that defendant represented to Marwais Steel that they had delivered said message to him; that said misrepresentation was made in total disregard of the consequences to plaintiff and knowing that plaintiff would lose his job thereby; and that defendant was motivated by malice, ill will, oppression and fraud. Plaintiff prayed judgment for loss of wages according to proof and for punitive damages in the sum of $100,000. Defendant answered denying the charging portions of the complaint and alleged that the message was accepted by defendant subject to the terms of its standard message contract, one of the terms of which was that defendant should not be liable for nondelivery beyond the sum of $500.

A jury awarded plaintiff the sum of $13,540 plus punitive damages in the sum of $50,000. Thereafter, the court granted defendant's motion for judgment notwithstanding the verdict on the issue of punitive damages, and provided that if its judgment in this respect were reversed on appeal, defendant's motion for a new trial was granted on the ground of insufficiency of evidence to support the verdict; and denied defendant's

motion for a new trial on the issues of compensatory damages, as well as defendant's motion for judgment notwithstanding the issue of compensatory damages in excess of $500.

Plaintiff appeals from the judgment notwithstanding the verdict and the alternative order granting the new trial. Defendant appeals from the portion of the judgment as originally entered relating to punitive damages and from the portion of the judgment awarding compensatory damages in excess of $500.

## FACTS

Plaintiff worked for Marwais Steel as a specialist. In the spring of 1970, there was a substantial layoff of personnel at Marwais Steel, and Trammell was among those laid off. After the layoff, Trammell was eligible for rehire from the seniority list when the company had additional work and needed additional men.

In May 1971, Gus Gustavson, the plant superintendent, had a telegram sent by Mrs. Delores Miller, the payroll clerk, to Trammell telling him to report to Gustavson. At that time Gustavson had a position for Trammell.

Mrs. Miller sent a message to Western Union via a direct TELEX line from Marwais Steel to the Western Union office. That message was addressed to 19 or 20 laid off employees, including Trammell, and read, "Please call Gus Gustavson at 524-7311 regarding return to work."

Mrs. Miller testified that Marwais Steel required a "Report delivery get sign on following message" treatment on such telegrams. She testified that as to the meaning of the terminology used, "We are asking Western Union to report back to us the message was received and signed before [sic] by the party sent to"; that the man being called back to work was to sign for the telegram. Western Union personnel testified that in a "report delivery" telegram, as above, it was proper company procedure for a responsible adult at the address given on the telegram to sign if the addressee was not there. Jerry Campbell, Western Union's customer service manager in San Francisco, stated that the proper company procedure for a situation where only the addressee can sign for the telegram was for the sender to request instructions be put on the message that a "personal delivery only, report delivery, get signature" is required.

The telegram which Mrs. Miller requested sent to Trammell came back marked "Addressee unknown." Mrs. Miller then obtained a more current address, 5909 Dover Street, Oakland, and had a telegram sent to that address on May 5, 1971. She received notification from Western Union reading, "Your telegram to Jimmie Trammell delivered at 805P 5TH." She understood this to mean that Trammell had received Marwais Steel's message.[1] When Marwais Steel did not hear from Trammell within 48 hours, he was terminated.

In the "report delivery" type of service used in this case, Western Union requires that the messenger delivering the telegrams get a signature from the person who *accepts* the telegram on a Western Union form called a route-call record. The procedure allows the telegram to be left with any responsible adult at the same address as the addressee of the telegram. After the telegram is delivered the messenger returns the route-call record to the Western Union office, and the delivery and its time and date are reported to the sender. The route-call record with the signatures on it is then given to the delivery clerk in Western Union's Oakland office and filed in a cabinet where it is retained for six months.

In the instant case, the telegram to Trammell carried an originating wire number, assigned to the message when it came from Marwais Steel, of L OLD359. The route-call record in this case contained a space for four telegrams. The bottom space bears the number L OLD359 and shows that someone whose first name was Robert signed for the telegram. The surname is illegible, although one witness testified that it looked like "Hanson." There is no indication on the route-call record that the telegram was left at an address other than 5909 Dover Street, Oakland. The telegram was delivered by a messenger with 11 years experience.

On Wednesday, May 5, 1971, Trammell lived at 5909 Dover Street, Oakland, a small apartment house with each apartment having its own number. Trammell testified that no friends had stayed at the apartment, and he knew no one named Robert Hanson or Harmon.

Trammell did not receive the telegram. However, during the weekend of May 8, he learned that a friend whose seniority number was close to his own had been called back to work. On Monday, May 10, Trammell

---

[1] Western Union's Campbell testified that this notification was not meant to convey that a signature was obtained from anyone in particular; that the notification was to be read in conjunction with the telegram for which it was responding.

went to see Gus Gustavson at Marwais Steel to find out when he would be called back to work. Gustavson told him that a telegram had been sent, gave him a copy of the message which Marwais Steel had sent to Western Union, and explained that Trammell was terminated because he had not reported to work within the specified time. Trammell then went to the union hall and spoke with his business representative. He wanted his job back and felt the business representative could talk to Marwais Steel and help him regain his job as he had not received the telegram. The business representative called Gustavson and then told Trammell the same thing that Gustavson had, that there was nothing they could do unless Western Union admitted that they had made a mistake.

Trammell testified that after this he started calling Western Union phone numbers; that every time he reached one number, he would be given another; that he got the "run around." Trammell finally talked to Max Fisher, the Western Union operations manager in Oakland. As operations manager, Fisher was in charge of general supervision over the operating functions in the main office, as well as the branch offices and agencies in his area. Trammell testified that he told Fisher that the only way he could get his job back was if some official with Western Union admitted that a mistake had been made; that he did not receive the telegram because someone at Western Union had made a mistake; and that he needed his job because it was his livelihood. Trammell testified that Fisher told him if Western Union said he received the telegram, then as far as Fisher was concerned he had received it, and if Trammell cared to take the matter further he should get an attorney. Trammell stated that he called Fisher again explaining that he would lose his job unless Fisher gave him a letter saying that Western Union had made a mistake, and that Fisher refused to do anything for him.

Western Union presented evidence that prior to the incident in question the union had negotiated an agreement with Western Union resulting in a move of all customer complaint and service activities from Oakland to San Francisco. Under the union contract all customer service calls were required to be transferred to customer service in San Francisco. Under certain circumstances, such as when a customer physically came into the office or when a customer insisted that the complaint be taken and that he not be switched to San Francisco, the information would be taken down on a customer inquiry report form and forwarded to San Francisco. This was done in the instant case by Fisher.

Fisher sent a memorandum of service inquiry, dated May 11, 1971, to Jerry Campbell, customer service manager in San Francisco. The memorandum indicated that Trammell was inquiring about a telegram and showed that the inquiry concerned nondelivery of a "report delivery" telegram addressed to Trammell and sent by Marwais Steel. Subsequently, Trammell's attorney wrote to Fisher explaining that Trammell had lost his job; that Trammell had been advised by Marwais Steel that a telegram had been delivered to him instructing him to return to work; that Trammell denied receiving the telegram; and that the attorney was trying to find out whether the telegram was delivered to the wrong person or to someone who promised to forward it to Trammell, and asking Fisher to call him. Fisher forwarded the letter to Campbell and also called the attorney. Fisher also sent a second memorandum of service inquiry a week to 10 days after the first. It read in part, "Addressee claims this is an old case and has received no action—claims lost job due to delivery to wrong person." On May 27, the attorney sent a letter to Campbell enclosing copies of the message to Trammell and the report to Marwais Steel. A few days later Western Union went on strike through July 27.

Fisher testified that he knew that if Trammell could establish that he had not received the telegram, he could get his job back, and that he knew this was what Trammell was trying to establish. He knew that he could obtain the telegram identification number from either Marwais Steel or the San Francisco office, and with the number discover what happened to the telegram by going to the route-call record file in his own office. However, he did not attempt to locate the records himself, but referred the matter to San Francisco.

Lester Eustace, the Western Union district manager and Fisher's superior, testified that he first heard of the case from Fisher a few days after Trammell called Fisher. He approved of what Fisher did and took no additional action himself. He had no authority over Jerry Campbell.

Jerry Campbell was the customer service manager in San Francisco. It was his responsibility to coordinate all customer inquiries, to handle inquiries as fast as possible and to make sure that a customer was notified regarding the facts on the handling of a telegram or given a truthful answer in regard to an inquiry. He testified that normally he would give a memorandum of service inquiry, such as the one sent by Fisher, to one of his two staff members to handle. The staff person would usually send to the bookkeeping department for a copy of the original

telegram involved, and then after getting a copy of the message call to the Oakland office to try to obtain the route-call record.

In the instant case, Campbell did not remember what he did to attempt to solve the problem when it was first referred to him. He had no records to indicate whether he did anything at all upon receiving either the first or second memorandum of service inquiry. There was nothing in the department records to show that any action was taken. He admitted he knew that there was some question as to whether the telegram was properly delivered; that Marwais Steel attached importance to the notice that delivery had been made; and that Western Union had an obligation to accurately report the fact of delivery. He or one of his staff knew that Trammell had lost his job when the second memorandum of service inquiry was received.

He testified that during the Western Union strike, from June 1 to July 27, no work was done in the customer service department as his staff was on strike and he was assigned to work computers. The first working day after the strike Campbell sent Trammell's attorney a letter acknowledging the attorney's letter of May 27, returning the photocopies on which Campbell circled in red the telegram transmission numbers, enclosing a copy of the route-call card and a copy of the report delivery, circling in red the identification numbers and showing the signature on the route-call card, and stating that if he could be of further assistance to contact him. Campbell testified that he heard nothing further from anyone involved until the lawsuit was filed in March 1972.

1. *Western Union's liability was limited to $500.*

██ Western Union contended to the trial court that its liability to Trammell was limited to $500. The trial court determined that this point had no merit. As will be discussed, this determination was erroneous and the judgment should be reversed to the extent that it permits recovery of compensatory damages in excess of $500.[2]

Pursuant to Public Utilities Code section 489, Western Union's standard form of message contract was filed with the California Public Utilities Commission (hereinafter "PUC") as part of its tariff provisions.[3]

---

[2] Western Union concedes that Trammell is entitled to receive the $500 limit of liability amount.

[3] The following are the relevant provisions of the tariff: "(a) The Telegraph Company shall not be liable for mistakes or delays in the transmission or delivery, or for

The tariff was in effect on May 5, 1971, when the telegram was sent to Trammell.[4]

Trammell concedes that the limitation of liability provisions exist and that, in a proper case, they would have the force and effect of law and would be binding. However, Trammell contends that the limitation of liability provisions do not apply to the instant case because (1) the limitation of liability provisions do not apply to the addressee of a telegram who had no knowledge of them and did not assent to them, (2) the limitation of liability provisions do not apply to an error which could not be prevented by repetition, (3) the limitation of liability provisions do not apply when there has been gross negligence, and (4) the limitation of liability provisions do not apply to acts not arising out of errors in transmission or delivery.

 *The limitation of liability provisions are applicable to the addressee of the telegram whether or not he knew of or assented to same.*

Public Utilities Code section 489 requires every public utility to file with the PUC a schedule showing all rates, tolls, charges and classifications, together with all rules, contracts, privileges or facilities which in any manner affect or relate to rates, tolls, rentals, classifications or service. Under Public Utilities Code section 761, the PUC must prescribe rules for the performance of any service by a public utility and the public utility must render such service within the time and upon the conditions provided in such rules. Pursuant to the above, the tariff, including the provisions here considered, was filed and approved. Thus, as

---

non-delivery, of any message received for transmission at the unrepeated-message rate beyond the sum of five hundred dollars; nor for mistakes or delays in the transmission or delivery, or for non-delivery, of any message received for transmission at the repeated-message rate beyond the sum of five thousand dollars, *unless specially valued*; nor in any case for delays arising from unavoidable interruption in the working of its lines. [¶] (b) In any event the Telegraph Company shall not be liable for damage or mistakes or delays in the transmission or delivery, or for the non-delivery, of any message, whether caused by the negligence of its servants or otherwise, beyond the actual loss, not exceeding in any event the sum of five thousand dollars, at which amount the sender of each message represents that the message is valued, unless a greater value is stated in writing by the sender thereof at the time the message is tendered for transmission, and unless the repeated-message rate is paid or agreed to be paid and an additional charge equal to one-tenth of one per cent of the amount by which such valuation shall exceed five thousand dollars."

[4]It is undisputed that the telegram to Trammell was received by Western Union for transmission at the unrepeated message rate from a point in Richmond to a point in Oakland.

Western Union properly asserts, it is the PUC, empowered by the Legislature, and not the parties to the transaction, which by approving the tariff fixed the terms and conditions upon which a telegram message is sent. The law, not a contract between the parties, prescribes the classifications, rates and liabilities attendant thereon. The law applies to the sender and recipient alike.

That such tariffs have the force of law was established in respect to *interstate* messages in the case of *Western Un. Tel. Co.* v. *Esteve Bros. & Co.* (1921) 256 U.S. 566 [65 L.Ed. 1094, 41 S.Ct. 584]. There an error occurred in the transmission of a telegram from Esteve Bros.' main office to a branch office. Under the 1910 Act to Regulate Commerce, Western Union had filed a tariff of telegram and cable rates (which was approved by the Interstate Commerce Commission) which embodied rules and regulations, including a limit of liability provision similar to the one in the case at bench. The Supreme Court noted that in sending the message Esteve Bros. did not in fact assent to any limit of liability as it did not use a telegram blank containing the limitation of liability provision, nor did Esteve Bros. have actual knowledge of the tariff. The Supreme Court wrote: ". . . the 'Act of 1910 was designed to and did subject such companies as to their interstate business to the rule of equality and uniformity of rates.' If the general public upon paying the rate for an unrepeated message accepted substantially the risk of error involved in transmitting the message, the company could not, without granting an undue preference or advantage extend different treatment to the plaintiffs here. The limitation of liability was an inherent part of the rate. The company could no more depart from it than it could depart from the amount charged for the service rendered.

". . . Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed. Assent to the terms of the rate was rendered immaterial, because when the rate is used, dissent is without effect." (At pp. 571-572 [65 L.Ed. at pp. 1097-1098].)

Similarly, California cases have held that "A public utility's tariffs filed with the PUC have the force and effect of law." (*Dollar-A-Day Rent-A-Car Systems, Inc.* v. *Pacific Tel. & Tel. Co.* (1972) 26 Cal.App.3d 454, 457 [102 Cal.Rptr. 651]; see also *Waters* v. *Pacific Telephone Co.*

(1974) 12 Cal.3d 1 [114 Cal.Rptr. 753, 523 P.2d 1161]; *Dyke Water Co.* v. *Public Utilities Com.* (1961) 56 Cal.2d 105, 123 [14 Cal.Rptr. 310, 363 P.2d 326]; *Riaboff* v. *Pacific T. & T. Co.* (1940) 39 Cal.App.2d Supp. 775, 778 [102 P.2d 465].)

The California situation is analogous to the regulation of interstate telegram service by the federal law. In California, the PUC sets and regulates the rates, undoubtedly in part to obtain uniform and equal rates. The limitation of liability provisions are an inherent part of the established rates and have the force and effect of law. As the tariff and the limitation of liability provisions have the force and effect of law, they are binding on the public generally and necessarily on the recipient of a telegram.

Persuasive authority for this position comes from the Supreme Court of North Carolina. In *Russ* v. *Western Union Telegraph Co.* (1943) 222 N.C. 504 [23 S.E.2d 681], an addressee sued for negligent failure to deliver a death message. Western Union claimed limited liability pursuant to a provision (similar to that in the case at bench) contained in a tariff approved by the state public utilities commission. In upholding Western Union's contention, the court wrote: "In the enactment of the above legislation, the General Assembly undoubtedly had in mind the establishment of uniform service by public utilities, and likewise the establishment of uniform rates for such service within the prescribed classifications. The classification is made a part of the rate, and the approval of the tariff schedule makes it the legal standard, which the parties may not vary or change by agreement. The rate then becomes a matter of law rather than one of contract. The parties agree with respect to the transmission and delivery of the telegram and its classification. The rate is fixed by the approved uniform tariff schedule. Assent to the rate is rendered immaterial because when the rate is used, dissent is without effect. Ita lex scripta est. The classification is a part of the rate; likewise the limitation of liability. 'Such limitations are inherent parts of the rates themselves.' State ex rel. Western Union v. Public Service Comm., 304 Mo. 505, 264 S.W. 669, 672, 35 A.L.R. 328.

"If uniformity is to prevail, the tariff schedule must represent the whole duty and the whole liability of the company rendering the service. Knight v. Carolina Coach Co., 201 N.C. 261, 159 S.E. 311. Thus, the company is not contracting against its negligence. The law fixes the rate to be paid and the extent of the liability to be assumed. Neither party is allowed to depart from this standard of duty and measure of liability.

The two are component parts of an integrated whole. The one is as sacrosanct as the other. The 'rate' as the term is used in the statute with all that it implies, is withdrawn from the field of agreement. The approved tariff schedule is not subject to modification or change by the parties. It contains both the legal standard and the limitation of liability. Annotation, 35 A.L.R. 336." (At p. 684.)

Also, in *Sims v. Western Union Telegraph Company* (1963) 37 Misc.2d 943 [236 N.Y.S.2d 192] (a New York trial court decision), a factual situation similar to the instant case was resolved against the telegram recipient. There the plaintiff allegedly sustained damage due to the nondelivery of a telegram from his employer calling him back to work. The court noted that there was a $500 limitation of liability under the state's public service law and that such was analogous to the law applied in cases arising out of interstate commerce, and therefore that the court should be guided by the decisions of the United States Supreme Court where applicable. The court stated: "That the plaintiff as a sendee is bound by the rates and provisions filed with the Federal Communications Commission (or the P.S.C.) is established law. (Western Union Telegraph Company v. Czizek, 264 U.S. 281, 44 S.Ct. 328, 68 L.Ed. 682; Gardner v. Western Union Telegraph Company, 8 Cir., 231 F. 405; MacDonald v. Western Union Telegraph Company, 176 Misc. 422, 27 N.Y.S.2d 666.)

"The fact that the plaintiff might not have been aware of the regulations as filed does not make the regulations inapplicable to him. (Western Union Telegraph Company v. Esteve Brothers & Co., 256 U.S. 566, 41 S.Ct. 584, 65 L.Ed. 1094; Wolynski v. Western Union Telegraph Company, 118 Misc. 115, 192 N.Y.S. 583.)

" . . . . . . . . . . . . . . . . . . . . .

" . . . Once the telegraph company filed its rate with the necessary commission it was the only lawful rate and the limitation of liability became the lawful condition upon which a message could be sent. If the public, upon payment of the rate, accepted the risk of error in sending an unrepeated message, the company could not, without granting an undue preference or advantage to the plaintiff, give the plaintiff any different treatment than that afforded the public at large. A rate lawfully established applies equally to all and it represents the whole duty and the whole liability of the company. Thus, the old common law liability cannot apply. No degrees of liability are expressed in the regulations and

the courts may not annex conditions to the rate affecting its uniformity and equality. (Western Union Telegraph Company v. Priester, 276 U.S. 252, 48 S.Ct. 234, 72 L.Ed. 555.)" (At pp. 194-195.)

Further support for this position is found in the case of *Cole* v. *Pacific Tel. & Tel. Co.* (1952) 112 Cal.App.2d 416 [246 P.2d 686], a case concerning a failure to list plaintiff in the yellow pages and whether a limitation of liability provision filed with the PUC controlled. The court discussed applicable cases from other jurisdictions upholding the right of regulated utilities to limit their liability and stated: "The theory underlying these decisions is that a public utility, being strictly regulated in all operations with considerable curtailment of its rights and privileges, shall likewise be regulated and limited as to its liabilities. In consideration of its being peculiarly the subject of state control, 'its liability is and should be defined and limited.' (*Correll* v. *Ohio Bell Tel. Co., supra.*) There is nothing harsh or inequitable in upholding such a limitation of liability when it is thus considered that the rates as fixed by the commission are established with the rule of limitation in mind. Reasonable rates are in part dependent upon such a rule." (At p. 419.) (See also *Davidian* v. *Pacific Tel. & Tel. Co.* (1971) 16 Cal.App.3d 750 [94 Cal.Rptr. 337].)

And, as recently as 1974 the California Supreme Court noted approvingly that, "The subject of limitations upon liability of telephone utilities has long been considered to be a proper subject for commission regulation and supervision, . . ." (*Waters, supra,* at p. 6.)

Although there appear to be no California cases directly concerning the application of limitation of liability provisions to a third party, not a party to the contract for service with the public utility, the facts that the California situation is analogous to that of other jurisdictions; that California cases hold public utility tariffs to have the force and effect of law; and that in California reasonable rates are in part dependent upon limitation of liability, lead to the conclusion that the recipient of a telegram is bound by the tariff's limitation of liability provisions.[5]

---

[5]It is noted that *Hart* v. *Western Union Telegraph Co.* (1885) 66 Cal. 579 [6 P. 637] and *Coit* v. *Western Union Tel. Co.* (1900) 130 Cal. 657 [63 P. 83] (cases concerning telegrams), are of no aid in determining the issue of whether a recipient of a telegram is bound by the limitation of liability provisions because both of the cases were before the creation of the PUC in California and considered the issue of limitation of liability upon a contract theory.

■ *The limitation of liability provisions do apply to an error which could not be prevented by repetition.*

■ Trammell contends that delivery of a telegram to the wrong person or failure to deliver at all is not something which could be prevented by using the repeated message rate;[6] and that therefore the limitation of liability provisions should only be applied to cases where repetition will afford some protection against mistake.[7]

The plain meaning of the limitation of liability provisions in the tariff is that Western Union shall not be liable beyond $500 for nondelivery of a message received for transmission at the unrepeated message rate. Essentially what Trammell is contending is that the rule is unreasonable. He is in the wrong forum to raise such an issue. "Such questions of reasonableness should first be directed to the Public Utilities Commission which by section 35 of the Public Utilities Act is vested with jurisdiction to make such determination. [Citation.] If after complaint to the commission, a party is still dissatisfied, he is free to invoke the appropriate extraordinary remedy."[8] (*Cole, supra,* at p. 420.) And, in *Waters, supra,* at page 7, the court approved this holding. (Also see *Pacific Tel. & Tel. Co.* v. *Superior Court* (1963) 60 Cal.2d 426, 430 [34 Cal.Rptr. 673, 386 P.2d 233].)

■ *The limitation of liability provisions do apply to instances of gross negligence.*

■ Trammell contends that Western Union's conduct constituted gross negligence and that the tariff provisions limiting liability do not apply where there has been gross negligence. However, plaintiff pleaded only negligence, not gross negligence, as a ground for the recovery of compensatory damages. And, the jury was not instructed on gross negligence, but was only instructed that the standard of care required by

---

[6]When the sender of a message orders it repeated (and pays the repeated message rate) the message is telegraphed back to the originating office for comparison.

[7]Under the limitation of liability provisions of the tariff, the repeated message rate (which is higher than the unrepeated message rate) increases the limit of Western Union's liability.

[8]Public Utilities Code section 1759 reads: "No court of this State, except the Supreme Court to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, except that the writ of mandamus shall lie from the Supreme Court to the commission in all proper cases."

law of Western Union was the exercise of great care and diligence in the transmission and delivery of telegrams. "Gross negligence has been said to mean the want of even scant care or an extreme departure from the ordinary standard of conduct." (*Van Meter* v. *Bent Construction Co.* (1956) 46 Cal.2d 588, 594 [297 P.2d 644].) Clearly in the instant case gross negligence was not the basis upon which the cause of action for compensatory damages was founded, nor was it the standard upon which the jury was instructed. ■ "The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal." (*Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715].) ■ As Trammell raises the theory of gross negligence for the first time on appeal, it must be disregarded.

Moreover, a reading of the provisions of the tariff's limitation of liability provisions reveals that the provisions do not by their wording limit liability merely to instances of ordinary negligence. In *Stern* v. *General Telephone Co.* (1975) 50 Cal.App.3d 538 [123 Cal.Rptr. 373], the court considered whether a provision of a telephone company tariff operated to limit liability for gross negligence as well as negligence. There plaintiff's action was for damages for alleged gross negligence of the phone company with respect to its obligations to provide phone service. Rule 26 of the phone company's tariff provided that for interruptions of service the company would allow the customer a credit on his bill proportionate to the number of days the telephones were out of service. The final line of the rule read: " 'In no case will the credit allowance for any period exceed the total bill for exchange service for that period.' " (At p. 540, fn. 1.) The court concluded that, "The language of rule 26 does not provide any basis for drawing a distinction between negligent interruptions and grossly negligent interruptions." (At p. 541.) Similarly, the language of the tariff provisions in the instant case provides no basis for drawing such a distinction.

While Trammell points to *Hart, supra,* at page 579 and *Coit, supra,* at page 657, to support his assertion that gross negligence is not protected by limitation of liability provisions, as these cases predated the creation of the PUC, no consideration is given therein to the problem with regard to tariffs on file with the PUC, and the cases are therefore not pertinent. Likewise, plaintiff's reliance upon *Davidian, supra,* at page 750, is ill founded as the part of that case to which plaintiff refers is based upon PUC Decision No. 77406 which specifically is limited in its findings to

telephone corporation services and not to any service rendered by Western Union as a telegraph corporation. (*Telephone Corporations,* 71 Cal.P.U.C. 229, 247.)

■ *The limitation of liability provisions are applicable as Western Union's liability, if any, arises from the transmission and delivery or nondelivery of the messages.*

■ Trammell asserts that the tariff provisions refer to "mistakes or delays in the transmission or delivery or for nondelivery of any message"; and that in the instant case as the real damage arose not from the nondelivery but from the subsequent false report of delivery to Marwais Steel and the later refusal of Western Union to correct this known falsity, the tariff provision limiting liability is not applicable.

However, Western Union's duty to Trammell is prescribed by Civil Code section 2162, "A carrier of messages for reward, must use great care and diligence in the transmission and delivery of messages." This was the only standard of care upon which the jury was instructed and is the sole basis of the jury's award of compensatory damages. No duty by Western Union has been shown to arise independent of the transmission and delivery or nondelivery of the messages. Therefore, the actions or failures to act of Western Union subsequent to the nondelivery cannot be an independent basis of Western Union's liability, and the tariff provisions do apply.

2. *The judgment notwithstanding the verdict was properly granted.*

■ Plaintiff appeals from the judgment notwithstanding the verdict on the issue of punitive damages, contending that there was substantial evidence for the jury to have made a finding of malice or oppression.

■ "It is settled that a motion for judgment notwithstanding the verdict should be granted only if a motion for directed verdict should have been granted (*DeVault* v. *Logan* (1963) 223 Cal.App.2d 802, 810 [36 Cal.Rptr. 145]) and that the cardinal requirement for the granting of either motion is the absence of any substantial conflict in the evidence. (*Robinson* v. *North American Life & Cas. Co.* (1963) 215 Cal.App.2d 111, 118 [30 Cal.Rptr. 57].) ■ Stated differently, a directed verdict or judgment notwithstanding the verdict may be sustained only when it can be said as a matter of law that no other reasonable conclusion is legally deducible from the evidence and that any other holding would be so

lacking in evidentiary support that the reviewing court would be compelled to reverse it or the trial court would be required to set it aside as a matter of law. (*Scott* v. *John E. Branagh & Son* (1965) 234 Cal.App.2d 435, 437 [44 Cal.Rptr. 384].) ██ The court is not authorized to determine the weight of the evidence or the credibility of witnesses. (*Palmer* v. *Agid* (1959) 171 Cal.App.2d 271, 276 [340 P.2d 303].) Even though a court might be justified in granting a new trial, it would not be justified in directing a verdict or granting judgment notwithstanding the verdict on the same evidence. (*Urland* v. *French* (1956) 141 Cal.App.2d 278, 282 [296 P.2d 568].)" (*Spillman* v. *City etc. of San Francisco* (1967) 252 Cal.App.2d 782, 786 [60 Cal.Rptr. 809].)

██ Civil Code section 3294 defines the standard for the awarding of punitive damages in a case such as the one at bench as follows: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." In the instant case plaintiff concedes that there was no evidence of fraud, but claims that there was substantial evidence of malice and oppression. ██ "Oppression" means subjecting a person to cruel and unjust hardship in conscious disregard of his rights. (*Richardson* v. *Employers Liab. Assur. Corp.* (1972) 25 Cal.App.3d 232, 246 [102 Cal.Rptr. 547] (overruled on other grounds, *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 580 [108 Cal.Rptr. 480, 510 P.2d 1032]).) "Malice" as used in Civil Code section 3294 has been defined as a motive and willingness to vex, harass, annoy or injure. (*Richardson, supra,* at p. 245; *Haun* v. *Hyman* (1963) 223 Cal.App.2d 615, 620 [36 Cal.Rptr. 84].) ██ "But malice in fact, sufficient to support an award of punitive damages on the basis of malice as that term is used in Civil Code section 3294, may be established by a showing that the defendant's wrongful conduct was wilful, intentional, and done in reckless disregard of its possible results." (*Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 713 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].)

██ The conduct which plaintiff asserts as the basis of his claim for punitive damages is the failure of Western Union to act speedily to admit or correct the mistake made in the delivery of the telegram. Assuming arguendo that Western Union did have a duty to plaintiff to admit or correct a mistake made in the delivery, the record still fails to show substantial evidence that Western Union's employees acted with either

malice or oppression in not providing information to correct or show the mistake at an earlier date.

Plaintiff testified that in his first conversation with Fisher, Fisher told him that if Western Union had said plaintiff received the telegram, then as far as Fisher was concerned he had received it and he should get an attorney if he cared to pursue the matter further; and that in his second conversation with Fisher, Fisher refused to do anything for him. But the evidence is undisputed that Fisher sent two memorandums of service inquiry to the customer service department, the maximum action which he was allowed to take on customer complaints under the union agreement with Western Union. As Fisher, as an employee, was forbidden to take any other action, it cannot be said that his conduct was either improper or motivated by oppression or malice.

Likewise, there was no evidence from which the jury could infer that Jerry Campbell, Western Union's customer service manager, acted with malice or oppression. There was no evidence that Campbell had any knowledge that processing plaintiff's complaint with additional speed would affect plaintiff's ability to get his job back, nor was there any evidence from which it could be inferred that in not responding with more speed Campbell acted with malice or oppression towards plaintiff. The court properly granted Western Union's motion for judgment notwithstanding the verdict. In view of this decision, it is not necessary for us to consider the appeal from the order granting a new trial.

The judgment notwithstanding the verdict is affirmed. As Western Union concedes its liability to Trammell for compensatory damages in the maximum amount allowable under the tariff ($500), the judgment for compensatory damages is reversed to the extent of recovery above $500, and that judgment is affirmed.

Defendant Western Union shall recover costs.

Taylor, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied May 12, 1976, and appellant's petition for a hearing by the Supreme Court was denied July 28, 1976.