IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

US AIRWAYS, INC., *Plaintiff/Appellant-Cross Appellee*,

*v.*

QWEST CORPORATION, a Colorado corporation, *Defendant/Appellee-Cross Appellant,*

SKYLINE STEEL, INC., an Arizona corporation; ONE CALL LOCATORS, LTD., d/b/a ELM LOCATING & UTILITY SERVICES, a Montana corporation, *Defendants-Appellees.*

No. 1 CA-CV 14-0226
FILED 10-01-2015

Appeal from the Superior Court in Maricopa County
No.  CV2011-001859
The Honorable Arthur T. Anderson, Judge

**AFFIRMED**

COUNSEL

Gallagher & Kennedy, P.A., Phoenix
By Kevin D. Neal, Jennifer A. Cranston, Liana J. Garcia
*Counsel for Plaintiff/Appellant-Cross Appellee*

Ryley Carlock & Applewhite, PA, Phoenix
By Rodolfo Parga, Jr., Andrea G. Lovell
*Counsel for Defendant/Appellee-Cross Appellant Qwest Corporation*

Audilett Kastner, PC, Tucson
By John J. Kastner, Jr.
*Counsel for Defendant/Appellee One Call Locators, Ltd.*

## O P I N I O N

Presiding Judge Maurice Portley delivered the Opinion of the Court, in which Judge John C. Gemmill and Judge Michael J. Brown joined.

**P O R T L E Y**, Judge:

**¶1**       In this case we address whether a provision in a public utility's tariff,[1] which limits the utility's liability for negligence, may limit a non-customer's damages for negligent telecommunication service interruption. US Airways, Inc. ("US Airways") claims that the superior court erred by granting Qwest Corporation's ("Qwest") motion for summary judgment to limit the amount of damages US Airways could recover for a four-hour telecommunication service interruption. US Airways also appeals the summary judgment granted to One Call Locators, Ltd. dba ELM Locating & Utility Services ("ELM"), the contractor that failed to properly find and mark underground cables. Finally, Qwest cross-appeals the determination that it owed a duty of care to US Airways. For the following reasons, we affirm the judgments.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**       US Airways operates a data center in Tempe. In January 2009, the owner of a nearby building entered into a contract with Skyline Steel, Inc. ("Skyline") to build carports in the parking lot adjacent to the data center. Skyline hired Arizona Blue Stake to locate and mark underground cables and power sources. Blue Stake notified Qwest, the owner of underground cable in the construction area, and Qwest hired ELM to search for and locate the cable.

**¶3**       ELM, however, was unable to locate Qwest's cable because Qwest's maps were inaccurate. Under its contract with Qwest, ELM was

---

[1] A "tariff" is a public document filed by a utility and accepted by a regulatory commission detailing services being offered; rates and charges for those services; and related governing rules, regulations, and practices. 64 Am. Jur. 2d (*Public Utilities*) § 61 (2011). The tariff for telephone utilities in Arizona is similarly defined at Arizona Administrative Code R14-2-501(20), and at Arizona Administrative Code R14-2-1102(14) for a telecommunications company.

supposed to contact Qwest for further instructions, but did not. Instead, ELM marked the ground with a "no conflict" mark, which inaccurately indicated that the Qwest cable had been located and was outside the excavation site. Skyline saw the marking, began construction and promptly severed the cable serving the US Airways data center, causing a four-hour telecommunication service interruption at the center. The interruption was not to any services Qwest provided to the data center, but only from the telecommunication services of AT&T and Electronic Data Systems.

¶4        US Airways sued ELM, then added Qwest and Skyline as defendants. US Airways alleged the defendants were negligent by failing to use reasonable care to locate, identify, mark, or supervise the excavation around its underground cable; claimed Qwest was vicariously liable for ELM's work; and sought nearly two million dollars in damages resulting from the service interruption. Skyline subsequently settled with US Airways.

¶5        Qwest moved to dismiss for failure to state a claim pursuant to Arizona Rules of Civil Procedure ("Rule") 12(b)(6), arguing that Section 2.1.3(B) of its Federal Communications Commission ("FCC") tariff and Section 2.4.1(A) of its Arizona Corporation Commission ("ACC") tariff barred or significantly limited any liability to US Airways. After briefing and argument, the court granted Qwest's motion in part, finding that the FCC tariff applied and limited Qwest's liability for its negligence to the proportionate service charge as defined in the federal tariff. US Airways filed an unsuccessful motion for reconsideration.

¶6        ELM subsequently filed a motion for summary judgment arguing it owed no duty to US Airways and that it was entitled to protection under Qwest's tariffs. US Airways responded by filing a cross-motion for partial summary judgment against Qwest and ELM on the issue of negligence. After briefing, the court found that ELM did not owe US Airways a duty, granted ELM's motion for summary judgment, and denied US Airways' partial cross-motion as to ELM. The court also denied the partial cross-motion as to Qwest, but found that as a matter of law Qwest owed a duty to US Airways.

¶7        At the request of US Airways and Qwest, the court entered a judgment in favor of US Airways against Qwest for $586.40, which represented the limited damages US Airways could receive under the federal tariff. The court entered a judgment in favor of ELM. US Airways appealed both judgments and Qwest filed a cross-appeal.

## DISCUSSION

### I

¶8  US Airways challenges the rulings leading to both judgments. US Airways argues that the court erred by finding that Qwest's FCC tariff limited its liability to the $586.40. Specifically, US Airways contends that the tariff provision does not govern claims by non-customers, and its enforcement in this case is unconstitutional and violates public policy. US Airways also claims that the court erred in granting ELM's motion for summary judgment and finding that ELM's contractual duty to Qwest did not extend to US Airways because ELM voluntarily assumed Qwest's duty to identify and properly mark the underground facilities.

### A.  Motion to Dismiss

¶9  We independently review the grant of a motion to dismiss pursuant to Rule 12(b)(6). *Coleman v. City of Mesa*, 230 Ariz. 352, 355, ¶ 7, 284 P.3d 863, 866 (2012); *N. Peak Constr., LLC v. Architecture Plus, Ltd.*, 227 Ariz. 165, 167, ¶ 13, 254 P.3d 404, 406 (App. 2011). "[W]e assume the truth of the allegations set forth in the complaint and uphold dismissal only if the plaintiff[ ] would not be entitled to relief under any facts susceptible of proof in the statement of the claim." *ELM Ret. Ctr., LP v. Callaway*, 226 Ariz. 287, 289, ¶ 5, 246 P.3d 938, 940 (App. 2010) (quoting *Mohave Disposal, Inc. v. City of Kingman*, 186 Ariz. 343, 346, 922 P.2d 308, 311 (1996)).

### 1.

¶10  US Airways contends that the tariff does not apply to its negligence claim because it is not a direct customer of Qwest. We disagree.

¶11  As a regulated public utility, Qwest's rates, rules, fees and responsibilities are governed by tariffs enacted and enforced by the FCC and the ACC.[2] *See* 47 U.S.C. § 203 (2012); Ariz. Rev. Stat. ("A.R.S.") § 40-365; *Sommer v. Mountain States Tel. & Tel. Co.*, 21 Ariz. App. 385, 387, 519 P.2d 874, 876 (1974); *Olson v. Mountain States Tel. & Tel. Co.*, 119 Ariz. 321, 323, 580 P.2d 782, 784 (App. 1978); *see also Re U.S. West Comm's, Inc.*, 131

---

[2] Qwest's FCC tariff regulates its interstate services, and its ACC tariff regulates its intrastate services. The FCC tariff contains provisions limiting Qwest's negligence liability to the proportionate service charge. *See infra* ¶ 16. And section 2.4.1(A) of Qwest's ACC tariff similarly limits its negligence liability "in the absence of gross negligence or willful misconduct."

P.U.R.4th 486, 1992 WL 486416 (Ariz. Corp. Comm'n Mar. 27, 1992). Federal courts examining federal tariffs have held that those tariffs have the force of law and "conclusively and exclusively control the rights and liabilities between a carrier and its customer." *MCI Telecomms. Corp. v. Graham*, 7 F.3d 477, 479 (6th Cir. 1993); *see also MCI Telecomms. Corp. v. Garden State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir. 1992). Likewise, we have held that state public utility tariffs are binding on all customers. *See Sommer*, 21 Ariz. App. at 387, 519 P.2d at 876 ("It is well established that where a telephone company files rules and regulations with the Public Utilities Commission, such rules and regulations are binding upon all customers w[he]ther or not they agree to or have knowledge of their existence."); *Olson*, 119 Ariz. at 323, 580 P.2d at 784 (upholding tariff limitation of liability).

¶12        Generally, Arizona, and other states, have held that a provision in a tariff that limits a public utility's liability for ordinary negligence in the delivery of its services is reasonable and will be upheld. *See Sommer*, 21 Ariz. App. at 387, 519 P.2d at 876; *Olson*, 119 Ariz. at 324, 580 P.2d at 785; *see also Pilot Indus. v. S. Bell Tel. & Tel. Co.*, 495 F. Supp. 356, 361-62 (D.S.C. 1979) (upholding tariff provision limiting telephone company's liability for service interruptions absent gross negligence or willful or wanton conduct); *Warner v. Sw. Bell Tel. Co.*, 428 S.W.2d 596, 603 (Mo. 1968) (noting that "such limitation provisions are generally valid and enforceable"); *Bulbman, Inc. v. Nev. Bell*, 825 P.2d 588, 590 (Nev. 1992) (adopting position held by most jurisdictions; namely, "upholding validly promulgated provisions of Public Service Commission tariffs and holding that the liability limitations contained in such tariffs apply to claims for simple negligence and breach of contract"); *Landrum v. Fla. Power & Light Co.*, 505 So. 2d 552, 554 (Fla. Dist. Ct. App. 1987) (same); *S. Bell Tel. & Tel. Co. v. Invenchek, Inc.*, 204 S.E.2d 457, 460 (Ga. Ct. App. 1974) (same); *Computer Tool & Eng'g v. N. States Power Co.*, 453 N.W.2d 569, 573 (Minn. Ct. App. 1990) (same); *Garrison v. Pac. Nw. Bell*, 608 P.2d 1206, 1211 (Or. Ct. App. 1980) (same); *Sw. Bell Tel. Co. v. Rucker*, 537 S.W.2d 326, 331–32 (Tex. Civ. App. 1976) (same). Courts enforce a tariff provision limiting liability because a public utility is strictly regulated, and, as a result, its liability should be defined and limited so that it may be able to provide service at reasonable rates. *Re U.S. West*, 131 P.U.R.4th at 505 (citing *Pilot Indus.*, 495 F. Supp. at 361).

¶13          There are, however, no Arizona cases addressing whether a tariff provision limiting liability for service interruption may be enforced against non-customers.[3]  In ruling on Qwest's motion, the superior court favorably cited a California Court of Appeals case, *Colich & Sons v. Pac. Bell*, 198 Cal. App. 3d 1225 (1988).  In *Colich*, an excavation subcontractor damaged a telephone company's underground cable, which caused service interruption for several of the company's customers, including United Airlines.  *Id.* at 1230.  United Airlines sued the subcontractor for negligence, and the subcontractor filed a cross-claim for indemnity against the telephone company for failing to properly mark the location of its underground cables.  *Id.* at 1230-31.

¶14          The telephone company moved to dismiss the action based on its tariff provision, which limited its liability to gross negligence or willful misconduct.  *Id.* at 1231.  The trial court granted the motion.  *Id.*  On appeal, the court announced that the "limitation of liability provisions in a tariff are binding on the public generally," including a party who "is not a customer of the telephone utility but instead is a stranger."  *Id.* at 1230.  After examining the tariff provision and California precedent, including *Trammel v. Western Union Telegraph Co.*, 57 Cal. App. 3d 538, 551-53 (1976),[4] the court held the tariff provision barred an action for ordinary negligence against the telephone company for interruptions "in *any* of the services or facilities

---

[3] US Airways cites several cases to support its argument that general principles of contract construction preclude the application of limitation of liability provisions to non-customers.  *See Davis v. Prot. One Alarm Monitoring, Inc.*, 456 F. Supp. 2d 243 (D. Mass. 2006) (plaintiff, who was not a party to bank's contract with alarm company, was not bound by its limitation of damages clause); *Young v. Tri-Etch, Inc.*, 790 N.E.2d 456 (Ind. 2003) (contractual limitation period did not bar claim of non-party to contract); *Kitz Corp. v. Transcon Shipping Specialists, Inc.*, 634 N.Y.S.2d 75, 76 (N.Y. App. Div. 1995) ("A party that is a stranger to a contract of carriage is not bound by limitations of liability in that contract.").  Those cases, however, are not persuasive because they deal with ordinary contracts between private companies rather than public utility tariffs.

[4] In *Trammel*, the addressee of a telegram allegedly lost his job because the telegram recalling him to work was negligently delivered to the wrong person.  57 Cal. App. 3d at 551-53.  The court rejected the argument that a tariff provision limiting the telegraph company's liability did not apply to a third party who had no knowledge of the tariff provision and had not assented to it, by finding that the tariff provisions "are binding on the public generally" because they "are an inherent part of the established rates and have the force and effect of law."  *Id.* at 551.

furnished by the Utility," and was binding on the public generally as an "inherent" part of establishing reasonable rates for public utilities. *Colich*, 198 Cal. App. 3d. at 1234-35.

¶15      Moreover, *Colich* determined that the economic damages suffered by United Airlines arose "exclusively from an interruption to its telephone service," and fell within the protection of the tariff because it fell within "damages arising from ordinarily negligent mistakes, omissions, interruptions, delays, errors or defects in *any* of the services or facilities furnished by the [u]tility." *Id.* at 1235 (internal quotation marks omitted). To hold otherwise, the court stated, would allow an end-run around the tariff and undermine the state's public policy to limit utilities' negligence liability. *Id.* at 1236. Based on the court's holding, there was little doubt that the tariff provision limiting the utility's liability for ordinary negligence barred the third-party contractor's claim for equitable indemnity. *Id.*

¶16      Here, Qwest's FCC tariff expressly limits its liability for service interruptions unless the interruption was the direct result of Qwest's willful misconduct. The tariff provision, in relevant part, provides:

**2.1.3 LIABILITY**

\* \* \*

The Company's [Qwest's] liability, if any, for its willful misconduct is not limited by this Tariff. With respect to any other claim or suit, *by a customer or by any others*, for damages associated with the installation, provision, preemption, termination, maintenance, repair or restoration of service, . . . the Company's liability shall not exceed an amount equal to the proportionate charge for the service for the period during which service was affected.

Qwest Corporation, Tariff F.C.C. No.1 § 2.1.3 (B)(1) (Oct. 2011) (emphasis added). The tariff provision applies to any claim, whether by customers "or by any others," as long as the claim is for damages "associated with the installation, provision, preemption, termination, maintenance, repair or restoration of service." *Id.* By including "any others," the tariff provision includes US Airways. Consequently, because US Airways seeks damages exclusively arising out of an interruption of its telecommunications services, the tariff provision limits Qwest's liability for ordinary negligence

to the proportionate service charge, even though US Airways was not Qwest's direct customer for the interrupted services.

**2.**

**¶17** US Airways also argues that enforcement of Qwest's tariff provision is unconstitutional and violates public policy. Specifically, US Airways argues that enforcing the provision would violate the anti-abrogation clause of the Arizona Constitution.

**¶18** Article 18, Section 6, of the Arizona Constitution states: "The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation." The anti-abrogation clause generally protects the right to file certain claims. In *Lerner v. DMB Realty, LLC,* we stated that "to be protected by the anti-abrogation clause, a cause of action must have existed at common law or have found its basis in the common law at the time the constitution was adopted." 234 Ariz. 397, 406, ¶ 36, 322 P.3d 909, 918 (App. 2014) (quoting *Dickey v. City of Flagstaff*, 205 Ariz. 1, 3, ¶ 9, 66 P.3d 44, 46 (2003)) (internal quotation marks omitted). As a result, in assessing whether a claim is protected under the anti-abrogation clause, we first must determine whether the right to file a negligence claim was among "those wrongs traditionally recognized at common law" including "the *right of people to seek remedy by due course of law* for injury to their lands, goods, person, or reputation." *Boswell v. Phoenix Newspapers, Inc.*, 152 Ariz. 9, 17-18, 730 P.2d 186, 194-95 (1986) (quoting Proposed Constitution of 1891, art. 2, § 15) (internal quotation marks omitted).

**¶19** Although negligence actions are part of Arizona's common law, a negligence action against a public utility for service interruption or other economic losses is not. The parties did not cite, and we did not find, any common law cases that allowed a party to sue a utility for negligence for service interruption. To the contrary, twenty years after the Gadsden Purchase, which reconciled border issues between the U.S. and Mexico following the Treaty of Guadalupe Hildago and created Arizona's southern border, the United States Supreme Court determined that a telegraph company could not be liable for any resulting damages caused by a mistake in transmission. *Primrose v. W. Union Tel. Co.*, 154 U.S. 1, 12 (1894). After examining a host of state court decisions which discussed the rules limiting a telegraph company's liability for any mis-transmission of messages, the Court found that any error in the transmission of the plaintiff's ciphered message was nothing more than ordinary negligence, and he could only recover the cost of sending the message but not any lost profits or other

damages because the true message was lost in translation. *Id.* at 14-34. This limitation, which had been one of contract, became one of law as a result of Congressional action in 1910. *See W. Union Tel. Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 571-72 (1921); *W. Union Tel. Co. v. Griffin*, 41 Ariz. 387, 390-91, 18 P.2d 653, 654 (1933). In fact, in *Esteve Bros.* the Court stated that for all telegraph messages sent:

> the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed. Assent to the terms of the rate was rendered immaterial, because when the rate is used, dissent is without effect.

256 U.S. at 572.

**¶20**    Our review of the case law reveals that before Arizona became a state there was no common law claim for ordinary negligence against a telegraph company or other public utility for damages exceeding the cost of service. And in 1912, when Arizona became a state, our constitution included a provision creating the ACC and giving the commission the power to "make reasonable rules, regulations, and orders, by which such [public service] corporations shall be governed in the transaction of business within the state." Ariz. Const. art. 15, § 3*; see State v. Tucson Gas, Elec. Light & Power Co.*, 15 Ariz. 294, 138 P. 781 (1914); *see also Ariz. Corp. Comm'n v. State ex rel. Woods*, 171 Ariz. 286, 290-94, 830 P.2d 807, 811-15 (1992) (discussing ACC history ). And we have upheld public utility provisions limiting the utility's liability for ordinary negligence. *Sommer*, 21 Ariz. App. at 387-88, 519 P.2d at 876-77; *Olson*, 119 Ariz. at 323, 580 P.2d at 784.

**¶21**    Arizona courts have never recognized a common law right for a person to sue a public utility for its ordinary negligence resulting in only economic damage where the utility has a tariff limiting its liability. The parties have cited no authority, nor have we found any, for the proposition that a customer or user of a telecommunications line may sue the owner of

that line for negligence for service interruption.[5] Rather, the tariff's provision limiting liability is consistent with the decisions in other jurisdictions, public policy, and Article 15, section 3 of the Arizona Constitution.

¶22 Even if the anti-abrogation clause was applicable, enforcing the tariff provision limiting liability for ordinary negligence would not violate the anti-abrogation clause because the tariff provision does not abrogate US Airways' negligence action, but only limits its damages. *See Ramirez v. Health Partners of S. Ariz.*, 193 Ariz. 325, 334-35, ¶ 32, 972 P.2d 658, 667–68 (App. 1998) (finding the Uniform Anatomical Gift Act did not unconstitutionally abrogate an action to recover damages for injuries); *see also Cronin v. Sheldon*, 195 Ariz. 531, 538, ¶ 34, 991 P.2d 231, 238 (1999) ("We have held that article 18, § 6 precludes *abrogation*, but not *regulation*."); *Jimenez v. Sears Roebuck & Co.*, 183 Ariz. 399, 407, 904 P.2d 861, 869 (1995) ("We long ago held that our constitution permits regulations effectively reducing a plaintiff's recovery."). Because the tariff provision does not bar US Airways' negligence claim but only limits its damages, and the provision does not prevent Qwest from being sued for willful conduct or gross negligence, *see Lindsay v. Cave Creek Outfitters, L.L.C.*, 207 Ariz. 487, 493, ¶ 21, 88 P.3d 557, 563 (App. 2003) ("[L]imiting recovery does not violate the anti-abrogation clause unless it 'completely abolishe[s]' the cause of action.") (quoting *Barrio v. San Manuel Div. Hosp., Magma Copper*, 143 Ariz. 101, 106, 692 P.2d 280, 285 (1984)), the tariff provision does not violate the constitutional anti-abrogation provision.

¶23 US Airways also maintains that Arizona public policy weighs against enforcing the tariff's provision limiting its damages. We disagree. "The courts have long recognized that limiting a public utility's liability benefits the public interest in the form of lower utility rates." *Re U.S. West*, 131 P.U.R.4th at 505 (citing *Pilot Indus.*, 495 F. Supp. at 361). State public utility commissions establish reasonable rates with limited liability exposure in mind. *Id.* Therefore, public policy does not preclude the enforcement of the tariff provision limiting a public utility's liability for ordinary negligence.

---

[5] Although US Airways cites *Sprint Communications Co. v. Western Innovations, Inc.* and *Mountain States Telephone & Telegraph Co. v. Kelton*, those cases are inapplicable because they involve actions by a line owner against an excavator for damages. *See Sprint*, 618 F. Supp. 2d 1101, 1108 (D. Ariz. 2009); *Mountain States*, 79 Ariz. 126, 127-28, 285 P.2d 168, 169 (1955).

### B.     Motion for Summary Judgment

**¶24**         US Airways argues that the superior court erred by granting ELM's motion for summary judgment and finding that ELM owed no duty of care to US Airways.  US Airways contends that, by entering into a contract with Qwest, ELM voluntarily assumed Qwest's duty to identify and mark Qwest's underground facilities.

**¶25**         We review a grant of summary judgment de novo and view the facts in the light most favorable to the non-moving party.  *Edwards v. Bd. of Supervisors of Yavapai Cty.*, 224 Ariz. 221, 222, ¶ 8, 229 P.3d 233, 234 (App. 2010) (citing *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12, 69 P.3d 7, 11 (2003)).    A court may grant summary judgment "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Ariz. R. Civ. P. 56(c)(1) (2012).  The determination of whether a genuine issue of material fact exists is based on the record made in the trial court.  *See Edwards*, 224 Ariz. at 222, ¶ 8, 229 P.3d at 234 (citing *Phoenix Baptist Hosp. & Med. Ctr., Inc. v. Aiken*, 179 Ariz. 289, 292, 877 P.2d 1345, 1348 (App. 1994)).

**¶26**         To establish a claim for negligence, a plaintiff must prove (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach of that standard of care by the defendant; (3) a causal connection between the defendant's conduct and the injury; and (4) actual damages.  *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9, 150 P.3d 228, 230 (2007) (citing *Ontiveros v. Borak*, 136 Ariz. 500, 504, 667 P.2d 200, 204 (1983)).  Whether a duty exists is a matter of law for the court to decide.  *Gipson*, 214 Ariz. at 143, ¶ 9, 150 P.3d at 230 (citing *Markowitz v. Ariz. Parks Bd.*, 146 Ariz. 352, 356, 706 P.2d 364, 368 (1985)).  And "absent some duty, an action for negligence cannot be maintained."  *Id.* at ¶ 11.

**¶27**         Duty is defined as an "obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm."  *Markowitz*, 146 Ariz. at 354, 706 P.2d at 366 (citing *Ontiveros*, 136 Ariz. at 504, 667 P.2d at 204).  A duty of care "may arise from special relationships based on contract, family relations, or conduct undertaken by the defendant" or from public policy considerations.  *Gipson*, 214 Ariz. at 145, ¶¶ 18, 22, 150 P.3d at 232 (citing *Stanley v. McCarver*, 208 Ariz. 219, 221, ¶¶ 7, 8, 92 P.3d 849, 851 (2004)).

¶28    US Airways argues that ELM voluntarily assumed Qwest's duty to all users of the Qwest cable to properly locate and mark the location of the cable prior to Skyline's excavation. However, as the superior court noted in its ruling, US Airways conflates the issue of duty owed by ELM to Qwest as a direct beneficiary into one owed to US Airways as a third party beneficiary. ELM had no contractual or other relationship with US Airways that would establish a duty to protect US Airways from economic harm.

¶29    Arizona law, following the Restatement, imposes a limited duty of reasonable care on a party who voluntarily undertakes to render services to another:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965); *see also Lloyd v. State Farm Mut. Auto. Ins. Co.*, 176 Ariz. 247, 250, 860 P.2d 1300, 1303 (App. 1992) (finding that although section 323 speaks of "physical harm," the "volunteer may be liable for economic harm as well"). And § 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

¶30 Section 323 does not apply because ELM did not undertake any action on behalf of US Airways. *See Luce v. State Title Agency, Inc.*, 190 Ariz. 500, 503-04, 950 P.2d 159, 162-63 (App. 1997) (finding that § 323 did not apply because defendant title company did not undertake an action on behalf of appellants). And if we assume, without deciding, that US Airways was a third party beneficiary of the agreement between ELM and Qwest, § 324A would not impose a duty on ELM because US Airways only suffered economic harm, not physical harm, as a result of the service interruption.[6] *See Gilbert Tuscany Lender, LLC v. Wells Fargo Bank*, 232 Ariz. 598, 602, ¶ 18, 307 P.3d 1025, 1029 (App. 2013) (declining to apply § 324A to impose a duty because plaintiff did not suffer any physical harm); *see also Lips v. Scottsdale Healthcare Corp.*, 224 Ariz. 266, 268, ¶ 11, 229 P.3d 1008, 1010 (2010) ("Courts have not recognized a general duty to exercise reasonable care for the purely economic well-being of others, as distinguished from their physical safety or the physical safety of their property") (citing Dan B. Dobbs, *The Law of Torts* § 452, at 329–31 (Supp. 2009)). Consequently, the superior court correctly found that ELM owed no duty to US Airways, and we affirm the ELM judgment.[7]

## II

¶31 On cross-appeal, Qwest argues that the court erred in finding that it owed a duty to US Airways. We review that question of law de novo. *Stanley*, 208 Ariz. at 221, ¶ 5, 92 P.3d at 851.

---

[6] The economic loss doctrine does not apply here because there was no contractual relationship between Qwest and US Airways. *See Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*, 223 Ariz. 320, 321, 327-28, ¶¶ 1, 39, 223 P.3d 664, 665, 671-72 (2010).

[7] Because we find that ELM did not owe a duty to US Airways, we need not address US Airways' argument that ELM is not entitled to protection under Qwest's FCC and ACC tariffs.

¶32    In denying US Airways' motion for partial summary judgment, the court held that Qwest, as the owner of the telecommunications cable, owed a duty to customers and users of the cable, including US Airways. The court relied on public policy considerations reflected in the Underground Facilities Act, commonly called Arizona's Blue Stake Law. A.R.S. §§ 40-360.21 to -360.32; *see generally Gunnell v. Ariz. Pub. Serv. Co.*, 202 Ariz. 388, 390-91, ¶¶ 7-11, 46 P.3d 399, 401-02 (2002).

¶33    Public policy may support the recognition of a duty of care. *Gipson*, 214 Ariz. at 145, ¶ 23, 150 P.3d at 232. Public policy may be found in statutes and common law. *Id.* at 146 n.4, ¶ 24, 150 P.3d at 233 n.4; *e.g.*, *Ontiveros*, 136 Ariz. at 509, 667 P.2d at 209 (finding duty based on dram shop statutes); *Estate of Maudsley v. Mesa Servs., Inc.*, 227 Ariz. 430, 436, ¶ 21, 258 P.3d 248, 254 (App. 2011) (finding duty based on mental health services statutes). A statute may establish a duty of care if it "is designed to protect the class of persons, in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation." *Gilbert*, 232 Ariz. at 601, ¶ 14, 307 P.3d at 1028 (quoting *Estate of Hernandez v. Ariz. Bd. of Regents*, 177 Ariz. 244, 253, 866 P.2d 1330, 1339 (1994) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 36, at 229–30 (5th ed. 1984) (internal quotation marks omitted)).

¶34    Arizona's Blue Stake Law imposes an affirmative obligation on an "underground facilities operator"[8] to carefully locate and mark its buried lines within two days of receiving notice of an excavation. Section 40-360.22(B) provides, in pertinent part:

> [U]pon receipt of the excavator's inquiry, the underground facilities operator shall respond as promptly as practical, but in no event later than two working days, by carefully marking such facility with stakes or paint or in some customary manner. . . . No person shall begin

---

[8] The Act defines "underground facilities operator" in relevant part as:

> [A] public utility, municipal corporation, landlord or other person having the right to bury underground facilities in any public street, alley, right-of-way dedicated to the public use or public utility easement . . . .

A.R.S. § 40-360.21.

> excavating before the location and marking are complete or the excavator is notified that marking is unnecessary. . . . An underground facilities operator may assign any marking or notification obligations required by this subsection to an agent or servant of the underground facilities operator.

Qwest does not dispute that the statute imposes an affirmative obligation to locate and mark its facilities, but argues that it did not owe a duty to US Airways because the Blue Stake Law authorizes a civil action for damages in favor of only utilities and excavators. *See* A.R.S. § 40-360.28(B).[9] However, in order to support a common law duty, a statute need not explicitly authorize a claim for damages. *Gipson*, 214 Ariz. at 146, ¶ 27, 150 P.3d at 233.

¶35 The question, as explained by our supreme court, is not "whether the legislature established a statutory cause of action, but whether there is a 'duty' or 'obligation' imposed" by the statute. *Ontiveros*, 136 Ariz. at 510, 667 P.2d at 210 (finding that a duty of care may be found in a statute silent on the issue of civil liability). Here, the Blue Stake Law explicitly imposes a duty on Qwest, as an underground facilities operator, to carefully mark its underground cable. Therefore, the legislation was enacted, in part, to protect end users like US Airways. Accordingly, the superior court did not err by determining that Qwest owed U.S. Airways a duty based on the Blue Stake Law.

---

[9] Section 40–360.28(B) states:

> If a violation of this article results in damage to an underground facility, the violator is liable to all affected underground facilities operators and excavators for all resulting damages proximately caused by the violations, including economic loss.

**CONCLUSION**

¶**36**        Based on the foregoing, we affirm the judgments granting Qwest's motion to dismiss and ELM's motion for summary judgment, and denying US Airways' cross-motion for summary judgment.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama