

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00103-CV

**CENTERPOINT ENERGY RESOURCES CORP.**,
Appellant

v.

Fernando **RAMIREZ** and Minerva Ramirez,
Appellees

From the 406th Judicial District Court, Webb County, Texas
Trial Court No. 2015CVT003262-D4
Honorable Oscar J. Hale, Jr., Judge Presiding

Opinion by:    Sandee Bryan Marion, Chief Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Patricia O. Alvarez, Justice
Beth Watkins, Justice

Delivered and Filed: March 25, 2020

AFFIRMED

CenterPoint Energy Resources Corp. appeals a judgment entered against it based on a jury verdict. The jury found in favor of Fernando and Minerva Ramirez and awarded them damages. On appeal, CenterPoint contends its tariff precludes liability against it for the Ramirezes' claims. Alternatively, CenterPoint contends the evidence is legally and factually insufficient to support the jury's findings on the Ramirezes' negligence and negligent undertaking claims, and the trial court erred in refusing to disregard the jury's finding of negligence per se because it was based on the

City of Laredo's building ordinances which cannot support a negligence per se claim against CenterPoint as a matter of law. We affirm the trial court's judgment.

## BACKGROUND

In 2011, Adrian and Graciela Castillo purchased a new house. The Ramirezes were Graciela's parents and frequently visited the Castillos' home.[1] On February 17, 2015, the Ramirezes were visiting the Castillos. While there, Fernando attempted to repair the electric clothes dryer at the Castillos' home when he inadvertently opened the gas valve to an unused gas line in the utility room. The gas ignited and exploded, severely injuring Fernando.

The City of Laredo's building ordinances required all gas valves or outlets that do not connect to an appliance in a house to be "capped gas tight." In addition, the ordinance provides, "During the process of turning gas on into a system of new *gas piping*, the entire system shall be inspected to determine that there are no open fittings or ends and that all *valves* at unused outlets are closed and plugged or capped." (emphasis in original). In addition to the City's ordinances, the provision of natural gas to homes is governed by a tariff. A tariff is a document filed by a utility with a regulatory agency and governs the relationship between the utility and its customers.

The Ramirezes sued: (1) CenterPoint, the entity that turned on and supplied the natural gas to the Castillos' home; (2) WestWind Homes d/b/a WestWind Development, G.P.-Laredo, LLC, the homebuilder; and (3) Armando Aguilar & Son Contractor, the plumbing subcontractor who installed the gas lines. As previously noted, the jury found in favor of the Ramirezes and assessed responsibility as follows: (1) CenterPoint – 34%; (2) WestWind – 60%; and (3) Aguilar – 6%. The Ramirezes settled with Aguilar before trial and with WestWind while this appeal was pending. CenterPoint is the only remaining appellant.

---

[1] The Ramirezes passed away while this appeal was pending.

**DOES THE TARIFF PRECLUDE LIABILITY?**

In its first issue, CenterPoint asserts its tariff precludes liability against it for the Ramirezes' claims as a matter of law, pointing to the provisions in the tariff that limit its liability for damage or loss caused by gas escaping from housepiping and damage or injury resulting from gas or its use after such gas leaves the point of delivery. The Ramirezes respond: (1) CenterPoint waived this defense by failing to introduce the tariff into evidence; (2) the tariff does not limit CenterPoint's liability to the Ramirezes because they are not CenterPoint's customers; (3) the rules in the tariff do not apply because they conflict with a valid municipal ordinance; (4) if the tariff applies to the Ramirezes, an exception to the limitation on liability applies due to CenterPoint's negligence in failing to maintain the meter loop; and (5) if the tariff applies, the limitations on liability violate the open courts provision of the Texas Constitution.

A.     Tariff Provisions

The tariff generally provides, "Unless otherwise expressly stated, these rules apply to all Consumers." The tariff contains the following provisions limiting CenterPoint's liability:

5.     SERVICE CONNECTIONS

***

(d) Housepiping. Consumer shall be responsible for installing and maintaining Consumer's housepiping. Company may refuse service to any consumer whose housepiping is inadequate or unsafe, but Company shall have no responsibility for determining whether or not Consumer has complied with applicable safety codes, inspecting Consumer's housepiping or in any way establishing or enforcing housepiping specifications. Information relating to piping may be obtained at the Company's local offices.

***

14.     ESCAPING GAS

Immediate notice must be given to Company by Consumer of any escaping gas on Consumer's premises. No flame shall be taken near the point where gas is escaping and as an added precaution, the gas should immediately be shut off at the meter by

Consumer.  Company shall not be liable for any damage or loss caused by the escape of gas from Consumer's housepiping or Consumer's appliances.

17      NON-LIABILITY

***

(b) Company shall not be liable for any damage or injury resulting from gas or its use after such gas leaves the point of delivery other than damage caused by the Company in the manner of installation of the service lines, in the manner in which such service lines are repaired by the Company, and in the negligence of the Company in maintaining its meter loop.  All other risks after the gas left [sic] the point of delivery shall be assumed by the Consumer, his agents, servants, employees, or other persons.

***

The tariff provides the terms "'Consumer, Customer and Applicant' are used interchangeably and mean a person or organization utilizing services or who wants to utilize services to CENTERPOINT ENERGY ENTEX."  The tariff defines the term "Consumer's Housepiping" to mean "[a]ll pipe and attached fittings which convey gas from the outlet side of the meter to the Consumer's connection for gas appliances."  The tariff also defines the term "point of delivery" to mean "[t]he point where the gas is measured for delivery into Consumer's housepiping."  Finally, the tariff provides "these rules apply to all Consumers regardless of classification, except insofar as they are changed by or are in conflict with any . . . valid municipal ordinance . . . in which case such . . . ordinance . . . shall control to the extent that it is applicable to the Consumer(s) in question."

B.      Filed-Rate Doctrine

The Texas Supreme Court has described the filed-rate doctrine as follows:

The "filed-rate doctrine" applies when state law creates a state agency and a statutory scheme under which the agency determines reasonable rates for the service provided.  The doctrine holds that a tariff filed with and approved by an administrative agency under a statutory scheme is presumed reasonable unless a litigant proves otherwise.  Thus, under the doctrine, filed tariffs govern a utility's

relationship with its customers and have the force and effect of law until suspended or set aside.

> Additionally, under the filed-rate doctrine, regulated utilities cannot vary a tariff's terms with individual customers, discriminate in providing services, or charge rates other than those properly filed with the appropriate regulatory authority. And a utility's obligations to its customers cannot exceed its duties under a filed tariff. It follows, then, that aggrieved customers cannot enforce alleged rights that contradict the tariff's provisions. Consequently, the filed-rate doctrine prohibits a customer from suing a utility in contract or tort over issues that a publicly-filed tariff's terms govern.

*Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 216–17 (Tex. 2002) (internal citations omitted).

With regard to the provisions in a tariff limiting liability, the court has noted:

> A regulatory agency's rate-making authority authorizes it to approve a tariff's provision limiting liability, because a limitation on liability is an inherent part of the rate the utility charges for its services. And, because regulatory agencies have this authority, we have applied the filed-rate doctrine to hold that a tariff provision that limits liability for economic damages arising from a utility's negligence is reasonable.

*Id*. at 217 (internal citations omitted). In *Grant*, the court also applied the filed-rate doctrine to hold a tariff provision limiting liability for a customer's personal injury damages is reasonable. *Id*. at 220.

C.    Did CenterPoint waive its affirmative defense based on the tariff by not having it admitted as evidence?

The Ramirezes argue this court cannot consider CenterPoint's defense to liability based on the tariff because CenterPoint failed to introduce the tariff into evidence. In support of this argument, the Ramirezes cite opinions referring to a tariff as evidence. *See Del Carmen Canas v. CenterPoint Energy Res. Corp.*, 418 S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("The summary-judgment evidence contains the CenterPoint tariff . . . ."); *Roberts Express, Inc. v. Expert Transp., Inc.*, 842 S.W.2d 766, 769 (Tex. App.—Dallas 1992, no writ) ("During Roberts's case in chief, the trial court admitted evidence of four separate tariffs Roberts used in billing its clients."); *Cont'l Oil Co. v. Simpson*, 604 S.W.2d 530, 532 (Tex. Civ. App.—Amarillo

1980, writ ref'd n.r.e.) ("During the course of the trial, the Simpsons offered Supplement No. 13 to Railroad Commission of Texas Motor Freight Commodity Tariff No. 7-L.").

CenterPoint responds the Texas Supreme Court has held a tariff "is not a mere contract between [a public utility] and its customers." *Grant*, 73 S.W.3d at 222. Instead, a filed tariff "approved under a statutory scheme acquires the force and effect of law and governs [a public utility's] relationship with its customers." *Id*. Accordingly, CenterPoint contends, "One can no more waive its application by not introducing it into evidence than one could waive a regulation or statute by failing to admit an official copy of that legal authority into evidence."

The Ramirezes cite a few older decisions holding "[c]ourts do not take judicial notice of [the] rules of the Railroad Commission." *Young v. McGill*, 473 S.W.2d 672, 673 (Tex. Civ. App.—El Paso 1971, no writ). However, Sections 2002.022(a) and 2002.054(1) of the Texas Government Code, which were enacted in 1993, require courts to take judicial notice of the Texas Register and agency rules published in the Texas Administrative Code. *See Eckmann v. Des Rosiers*, 940 S.W.2d 394, 399 (Tex. App.—Austin 1997, no writ); TEX. GOV'T CODE ANN. §§ 2002.022(a), 2002.054(1). As the Austin court explained, agency regulations "are legislative facts, or a part of the body of law a court is required to apply in reasoning toward a decision. As a source of law, agency regulations are like statutes or the decisions of a higher court to which a lower court owes obedience under the doctrine of stare decisis." *Eckmann*, 940 S.W.2d at 399 (internal citations omitted). Accordingly, given the changes in the law, we do not find the older decisions cited by the Ramirezes to be persuasive.

Given the Texas Supreme Court's statement that a tariff "acquires the force and effect of law" as it governs a public utility's relationship with its customers, *Grant*, 73 S.W.3d at 222, we take judicial notice of the tariff. *See Spinnaker Pointe Homeowners Ass'n v. TXU Elec. Delivery Corp.*, No. 05-06-01429-CV, 2007 WL 2247372, at *2 (Tex. App.—Dallas Aug. 7, 2007, no pet.)

(noting trial court took judicial notice of "Tariff for Retail Delivery Service of [E]lectricity"); *Sw. Bell Tel. Co. v. Nash*, 586 S.W.2d 647, 649 (Tex. Civ. App.—Austin 1979, no writ) ("Therefore there is no sound reason why Texas should not follow the federal rule in this regard and take judicial notice of the tariffs."). In analyzing whether a tariff conflicted with a city ordinance in *City of Richardson v. Oncor Elec. Delivery Co. LLC*, 539 S.W.3d 252, 256, 263 (Tex. 2018), the Texas Supreme Court compared a tariff to a "general law" and noted a tariff might prevail over the terms of a franchise contract between a public utility and its customer which incorporated a city ordinance where the franchise contract stated it would not affect or impair the rights, obligations, or remedies of the parties under state law. And, courts, including appellate courts, clearly can take judicial notice of statutes. *See In re A.M.S.*, No. 04-18-00650-CV, 2019 WL 137027, at *3 (Tex. App.—San Antonio Jan. 9, 2019, no pet.) (mem. op.) (noting "we take judicial notice of Texas statutes").[2] Accordingly, we conclude CenterPoint did not waive its affirmative defense by failing to introduce the tariff into evidence.

D.      Were the Ramirezes customers under the tariff's definitions?

As previously noted, the tariff generally states that its rules apply to all consumers and further provides the terms "'Consumer, Customer and Applicant' are used interchangeably and mean a person or organization utilizing services or who wants to utilize services to CENTERPOINT ENERGY ENTEX." At the time of the explosion, the Ramirezes were visiting the Castillos and were not residents or tenants of their home.

Although CenterPoint argues the definition of "customer" in its tariff broadly includes any person utilizing its services in the home, the Ramirezes correctly point out that the tariff provides

---

[2] We note in *Duderstadt Surveyors Supply, Inc. v. Alamo Express Inc.*, 686 S.W.2d 351, 354 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.), this court refused to consider the standard of care established by tariff rules the trial court was not afforded the opportunity to examine and consider. In the instant case, however, the trial court had the opportunity to consider the limitation on liability provisions in the tariff.

the terms consumer, customer, and applicant are used interchangeably. In addition, the tariff contains various references to these terms where extending the term to non-customers would be absurd, such as the definition of "Consumer's Housepiping," the requirement that the consumer provide additional information during the application process, and the required notice to the customer by CenterPoint before the customer's utility service can be terminated. *See Worsdale v. City of Killeen*, 578 S.W.3d 57, 73 (Tex. 2019) (noting construing statutes to avoid absurd results is a judicial function); *Hemyari v. Stephens*, 355 S.W.3d 623, 626 (Tex. 2011) (noting we avoid construing the language in an instrument that would lead to an absurd result). In its reply brief, CenterPoint contends the definition of "customer" can have different meanings based on the context in which the term is used. This argument is contrary to the tariff's statement that "'Consumer, Customer and Applicant' are used interchangeably" meaning each term can be substituted wherever any of the terms are used. Furthermore, if we were to accept CenterPoint's argument, anyone inside the home who turned on the hot water for any reason would be a "customer" because he or she would be "using" the services. For example, any repairman who used hot water to wash his hands would meet CenterPoint's interpretation of the definition of "customer." Accordingly, we hold the Ramirezes were not consumers, customers, or applicants under the tariff definition.

E.     Do the tariff's limitations on liability apply to non-customers?

The Ramirezes argue the tariff's limitations on liability only apply to customers' claims. CenterPoint argues the limitations on liability extend to any damage, injury, or loss caused by gas after it leaves the point of delivery or meter. CenterPoint further argues the limitations on liability are broadly worded to encompass all damage, injury, and loss and are not specific to a customer's damage, injury, or loss.

Whether the limitations on liability in a tariff extend to non-customers has not been directly addressed by the Texas Supreme Court. In describing the filed-rate doctrine in *Grant*, however, the Texas Supreme Court repeatedly noted a filed tariff governs a utility's relationship with its ***customers*** and prohibits a ***customer*** from suing the utility over issues the tariff's terms govern. 73 S.W.3d at 217, 222. More recently, the court described a tariff as setting the "rates and terms for a utility's relationship with its retail ***customers***." *City of Richardson*, 539 S.W.3d at 254 (emphasis added). Accordingly, the descriptions of a tariff in both of these opinions support the Ramirezes' position that the limitations on liability in the tariff did not apply to their claims because they were not CenterPoint's customers. And, although the issue has not been directly addressed by the Texas Supreme Court, two of our sister courts have addressed the issue.

In *Lone Star Caliper Co. v. Talty Water Supply Corp.*, Lone Star Caliper Co. occupied a building where a fire occurred. 102 S.W.3d 198, 200 (Tex. App.—Dallas 2003, pet. granted, judgm't vacated and remanded by agr.). The volunteer fire department "discovered that a fire hydrant that was supposed to be located next to the Building was missing and there was no water in a second adjacent hydrant." *Id*. Lone Star's property inside the building was significantly damaged or destroyed. *Id*. Talty Water Supply Corporation was the exclusive provider of water in its area of service, and the building was located in Talty's area of service. *Id*. Lone Star subsequently sued Talty asserting a negligence claim. *Id*. at 201. Talty moved for summary judgment on the basis of immunity and the filed-rate doctrine. *Id*. The Dallas court reversed the summary judgment and remanded the cause for further proceedings. *Id*. at 200.

In addressing the filed-rate doctrine, the Dallas court referred to the description of a tariff in *Grant*, noting "the filed rate or filed tariff doctrine prohibits a customer from suing a utility in contract or tort over issues that a publicly-filed tariff's terms govern." *Id*. at 202 (citing *Grant*). Paraphrasing this description, the court asserted, "In other words, the utility *and its customers* are

bound by the terms of the tariff." *Id*. (emphasis in original). After noting a tariff binds the utility and its customers, the Dallas court then reasoned Talty was required to establish Lone Star was one of its customers in order to enforce the terms of the tariff against Lone Star, asserting "[t]his is an essential element of the affirmative defense." *Id*. at 202–03.

In that case, the building's owner was Talty's customer, and Lone Star leased space in the building from the owner. *See id*. at 203. Talty did not argue Lone Star was bound by the terms of its tariff because it was a customer. *Id*. Instead, Talty argued Lone Star was bound by the terms of the tariff based on the lease between Lone Star and the building's owner. *Id*. The Dallas court quoted the tariff which provided Talty would bill any renters as a third party, but the building owner was responsible for any bills not paid by the renter. *Id*. The tariff also required the building's owner to sign an Alternate Billing Agreement and refer tenants or lessees to Talty's office "for renter's application and payment of appropriate deposit." *Id*. Thus, the Dallas court held the tariff contemplated and required a relationship between Talty and the renter separate from the renter's relationship with the building's owner. *Id*. Although Talty did not argue Lone Star was its customer, the Dallas court's analysis was based on its assertion that such a showing was "an essential element of [Talty's] affirmative defense" and was required in order for Talty to enforce the terms of the tariff against Lone Star. *Id*. at 202–03; *cf. BML Stage Lighting, Inc. v. Mayflower Transit, Inc.*, 14 S.W.3d 395, 400–01 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (holding third party's status as member of general public did not bind it to the terms of a carrier's tariff). Specifically, the Dallas court held:

> Talty failed to introduce summary judgment evidence establishing Lone Star was its customer at the time of the fire. Accordingly, it failed to establish it was entitled to judgment as a matter of law and the trial court erred in granting its motion for summary judgment.

*Lone Star Caliper Co.*, 1102 S.W.3d at 203.

Similarly, in *Henderson v. Cent. Power & Light Co.*, 977 S.W.2d 439, 442 (Tex. App.—Corpus Christi 1998, pet. denied), Keven and Linda Henderson were the owners of a house in Portland, Texas. The Hendersons later moved to Kansas and rented the house to Tuffie and Vonnie Hudson. *Id*. The Hudsons had Central Power and Light Co. (CPL) electrical service connected to the house in their name. *Id*. A fire occurred at the house, and the Hendersons sued CPL asserting negligence and DTPA claims. *Id*. at 443. The evidence at trial suggested "the fire started due to corrosion at the point where the Hendersons' aluminum wires connected to the meter base." *Id*. The meter base was "sealed by CPL and labeled with a warning to the customer not to open it." *Id*. "[T]he Hendersons claimed that CPL's seal locked them out of the meter enclosure and thereby led them to believe that its contents were being properly maintained by CPL, when in fact they were not." *Id*. "The jury found that neither the Hendersons nor CPL were negligent, but did find that CPL engaged in a false, misleading or deceptive act or practice and in an unconscionable action or course of action that were producing causes of the Hendersons' damages." *Id*.

One of the issues raised on appeal was whether CPL's tariff limited CPL's liability. *Id*. at 446–47. The Corpus Christi court held the Hendersons were not customers who were bound by the tariff. *Id*. at 447. The court relied on a general definition of "customer" as "[o]ne who regularly and repeatedly makes purchases of, or has business dealings with, a tradesman or business." *Id*. (internal quotation marks omitted). The court held the Hendersons "ended their purchases and business dealings with CPL when they moved out of the house and rented it to others." *Id*. The court further held the Hendersons did not "agree to be bound by the tariff and its limitations of liability by the fact that their renters chose to purchase power from CPL." *Id*.

As we read the existing precedent, two of our sister courts have held a tariff's limitations on liability are not binding on non-customers, and those decisions are consistent with the Texas Supreme Court's general descriptions of tariffs as only governing a utility's relationship with its

customers.[3]  Therefore, although we recognize a tariff has the "force and effect of law" as it governs the relationship between a utility and its customers, we hold the tariff's limitations on liability do not govern the relationship between a utility and a non-customer.  Accordingly, CenterPoint's liability to the Ramirezes is not limited by the tariff provisions.

**SUFFICIENCY**

In its third issue, CenterPoint challenges the sufficiency of the evidence to support the jury's liability finding on the Ramirezes' negligent undertaking claim.  Because we hold the evidence is sufficient to support the jury's finding, we do not address CenterPoint's second and fourth issues challenging the Ramirezes' negligence and negligence per se claims.  *See* TEX. R. APP. P. 47.1.

1.     Sufficiency

"The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).  In reviewing a legal sufficiency challenge, we "view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* at 807.  Evidence is legally insufficient when the record discloses "(a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only

---

[3] *See also Tyrus v. Indianapolis Power & Light Co.*, 134 N.E.3d 389, 406–07 (Ind. Ct. App. 2019) (holding legislature did not give, or intend to give, state agency power to shield public utility from liability caused by utility's negligence to noncustomers); *Abel Holding Co. v. Am. Dist. Tel. Co.*, 147 N.J. Super. 263, 269 (N.J. Super. Ct. App. Div. 1977) ("Counsel has not referred us to any case where a clause in a filed tariff, limiting liability, was held binding upon a stranger to the relationship between the utility and the customer, and our own research has failed to disclose any."); *but see U.S. Airways, Inc. v. Qwest Corp.*, 361 P.3d 942, 946–48 (Ariz. Ct. App. 2015) (following holding of California appellate court, *supra*, that limitation of liability in tariff extended to noncustomer's claims), *aff'd*, 385 P.3d 182 (Ariz. 2016); *Pac. Bell v. Colich*, 244 Cal. Rptr. 714, 718 (Cal. Ct. App. 1988) (holding limitation of liability provision in tariff to be binding on public generally because such a provision is an inherent part of the utility's established rates and has the force and effect of law).

evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; [or] (d) the evidence establishes conclusively the opposite of a vital fact." *Id*. at 810 (internal quotation marks omitted).

In a factual sufficiency review, we consider all the evidence supporting and contradicting the jury's finding. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside the jury's verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Whether reviewing the legal or factual sufficiency of the evidence, the "[j]urors are the sole judges of the credibility of the witnesses and the weight to give their testimony," and they may choose to believe some witnesses and not others. *City of Keller*, 168 S.W.3d at 819; *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

### B. Negligent Undertaking

Jury question No. 2 instructed the jury as follows:

> For purposes of this question, CenterPoint may also be negligent if there are facts to support that CenterPoint undertook, gratuitously or for consideration, to render services to another which CenterPoint should recognize as necessary for the protection of third parties including Fernando and Minerva Ramirez, and either (a) the failure to exercise ordinary care increased the risk of harm to Fernando and Minerva Ramirez; (b) CenterPoint undertook to perform a duty owed by another party to Fernando and Minerva Ramirez; or (c) the harm was suffered because of reliance of either the other party or Fernando and Minerva Ramirez upon CenterPoint's undertaking.

CenterPoint first contends there was no undertaking because Mike Martinez, CenterPoint's technician who turned on the gas service to the Castillo's home, never went inside the home. The Ramirezes respond the service CenterPoint undertook was turning on the gas to the home in compliance with the city ordinance. CenterPoint contends the undertaking could not be turning on the gas because the negligent undertaking was not inspecting the gas valve in the utility room. As the Ramirezes note, however, CenterPoint does not cite any authority to support its contention

that the service CenterPoint undertook could not be turning on the gas in compliance with the city ordinance. More importantly, nothing in the jury charge prevented the jury from finding the service CenterPoint undertook was turning on the gas in compliance with the ordinance.

In finding CenterPoint failed to exercise ordinary care in rendering the service it undertook, the jury could have relied on the record created by Martinez when he turned on the gas service to the Castillos' home. That record was entitled "Move-in Small Meter Install - Original" and stated, in pertinent part:

> T: 65110, 12-14-11, 3790600044972, 0000, .2
> T: 5, ERT#039254525, BUILT LOOP, SIT, LIT W
> T: /H, ELIG COOKTOP.PLUGGED CUT-OFF TO DRYER.

At trial, Martinez testified the word "original" in the title of the record meant he was installing a new meter. The record also noted the install was due to a "move in as per marketing." Martinez further testified: (1) 65110 was his employee number; (2) the thirteen digit number following the date of installation was the number of the meter; (3) the four zeros indicated that the meter dials were all set at zero; (4) the .25 meant the meter would release four ounces of pressure; (5) the ERT number indicated the meter is a smart meter which allows a truck to drive by and pick up the meter reading; (6) "built loop" showed that he built the meter loop; (7) "sit" was an abbreviation for shut-in test which meant the house line was tested and determined to be "gas tight," meaning no gas was leaking and the meter dials did not move when he turned on the gas to the house; (8) "lit" meant he lit the water heater; (9) "elig cooktop" was an abbreviation for "electric ignition cook top" which meant the house had a cooktop with no oven underneath; and (10) "plugged cut-off to dryer" meant he plugged the gas valve to the dryer.

As the factfinder, the jury was free to believe some evidence, disbelieve other evidence, and draw reasonable inferences from the evidence. *See City of Keller*, 168 S.W.3d at 819, 827. Based on the record created by Martinez and the expert testimony establishing the valve in the

Castillos' utility room was never plugged or capped, the jury could have found CenterPoint failed to exercise ordinary care because Martinez went inside the home, inspected the valves, but failed to ensure the valve in the utility room was plugged or capped. Alternatively, based on the expert testimony and CenterPoint's time records showing Martinez was not at the Castillos' home for a sufficient amount of time to install the meter loop and inspect the valves inside the home, the jury could have found CenterPoint failed to exercise ordinary care because Martinez turned on the gas without inspecting the valve in the Castillos' utility room to ensure it was "closed and plugged or capped" as required by the city ordinance.

CenterPoint next argues that it did not increase the risk of harm because the dangerous condition (the uncapped valve) already existed. *See Knife River Corp.-S. v. Hinojosa*, 438 S.W.3d 625, 634 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (holding evidence did not establish increased risk of harm where dangerous condition existed before defendant began work and defendant's failure to act with reasonable care did not increase that danger). We agree with the Ramirezes that turning on the gas without inspecting or ensuring the valves at unused outlets were "closed and plugged or capped" clearly increased the risk of the explosion. Because we hold the evidence is sufficient to support the jury's finding on the first negligent undertaking theory, we do not address the sufficiency of the evidence to support the other two negligent undertaking theories. *See* TEX. R. APP. P. 47.1

**CONCLUSION**

The trial court's judgment is affirmed.

Sandee Bryan Marion, Chief Justice