# Supreme Court of Texas

No. 20-0354

CenterPoint Energy Resources Corp.,
*Petitioner*,

v.

Fernando Ramirez and Minerva Ramirez,
*Respondents*

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

**Argued September 29, 2021**

JUSTICE DEVINE delivered the opinion of the Court.

Justice Huddle and Justice Young did not participate in the decision.

The issue of first impression in this personal-injury case is whether a limitation of liability provision in a utility tariff approved by state regulators bars the utility's liability for damages suffered by a residential customer's houseguests. We hold that it does. The tariff provides, without exception, that the utility "shall not be liable for *any* damage or loss" in the limited circumstance where damage or loss is

"caused by the escape of gas from Consumer's housepiping or Consumer's appliances."[1] That is precisely how the houseguests were injured, but the lower courts agreed with the houseguests that the liability limitation is applicable only to any damage or loss sustained by the utility's customer. We hold that the liability limitation precludes the houseguests' negligence claims because (1) the tariff's terms expressly apply to "all consumers" and (2) the houseguests meet the tariff's special definition of that term. A tariff approved by a regulatory body is not a "mere contract" and instead carries "the force and effect" of law, at least as to those to whom the tariff applies. The houseguests are bound by the tariff's terms because, as consumers, the tariff applies to them and, like any other law, neither assent nor actual knowledge is required to enforce its terms as written. We therefore reverse and render judgment that the tariff forecloses the houseguests' ordinary negligence claims against the utility.

## I. Background

In December 2011, Adrian and Graciela Castillo purchased a new home built by WestWind Homes d/b/a WestWind Development, G.P.-Laredo. The home's gas lines were installed by plumber Armando Aguilar & Sons Contractor. After the City of Laredo issued a certificate of occupancy certifying the home was habitable and built to code, the Castillos moved into the residence. Shortly thereafter, CenterPoint

---

[1] Emphasis added.

Energy Resources Corp. installed a gas meter outside the home and initiated gas service.

Over the next three years, Graciela's parents, Fernando and Minerva Ramirez, were frequent visitors and guests at the home. During these visits, the Ramirezes used the home's gas services, including for cooking and showering. In February 2015, while Fernando was attempting to repair the Castillos' electric clothes dryer, he inadvertently opened the valve on an unused gas line behind the dryer. Escaping gas accumulated to combustible levels and ignited, resulting in an explosion that damaged the Castillos' home and seriously injured Fernando.

The Ramirezes sued the homebuilder, the plumber, and CenterPoint for personal-injury damages under negligence and gross-negligence theories. The Ramirezes alleged that all three defendants had breached a duty to plug or seal the unused gas line. The Ramirezes did not contend that the defendants' equipment failed but, rather, that the defendants failed to provide essential equipment.

The plumber settled, and the case proceeded to a jury trial against the homebuilder and CenterPoint. After the close of the plaintiffs' case-in-chief, the trial court directed a verdict for the homebuilder and CenterPoint on the Ramirezes' gross-negligence and exemplary-damages claims. In response to three negligence submissions, the jury found that only the defendants were at fault and apportioned responsibility 60% to the homebuilder, 34% to CenterPoint,

3

and 6% to the plumber.[2]  The jury awarded the Ramirezes more than $6.9 million in actual damages.

CenterPoint moved for judgment notwithstanding the verdict and, in the alternative, a new trial.  The motion asserted a number of grounds, including that the jury's verdict was immaterial because CenterPoint is entitled to judgment as a matter of law based on the terms of its tariff, which was filed with and approved by state regulators. CenterPoint asserted that, under the filed-rate doctrine, the tariff's terms, which generally limit the company's liability for damages resulting from gas usage after delivery to the meter, are (1) binding as law, (2) presumed reasonable, and (3) applicable to the Ramirezes' ordinary negligence claims.

The trial court denied CenterPoint's motion and rendered judgment on the verdict.  Based on the jury's proportionate-responsibility findings, the trial court rendered judgment that the homebuilder was jointly and severally liable for all of the Ramirezes' damages and CenterPoint was liable only for its

---

[2] *See* TEX. CIV. PRAC. & REM. CODE § 33.003 (stating that a proportionate-responsibility jury issue shall include a settling party if there is sufficient evidence to submit a jury issue as to that party).

proportionate share of the damages.[3]  While the case was on appeal, the homebuilder settled with the Ramirezes.[4]

The court of appeals affirmed the judgment against CenterPoint.[5] With respect to the main issue here, the court held that the provisions in a utility's tariff are enforceable only against the utility's customers and the Ramirezes were not CenterPoint's customers, presumably because they did not contract for the utility's services.[6]  The court acknowledged that the tariff's special definition of "Consumer, Customer and Applicant" broadly defines the terms to mean "a person or organization *utilizing services* or who wants to utilize services to CENTERPOINT[.]"[7]  Even so, the court held that the scope of the defined term was narrowed to exclude houseguests like the Ramirezes because (1) the tariff states that the terms "'Consumer, Customer and Applicant' are used interchangeably" and (2) the terms "Consumer" and "Customer" are used in select tariff provisions that would be "absurd" if

---

[3] *See id.* § 33.013(b)(1) ("[E]ach liable defendant is, in addition to the defendant's liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action if: . . . the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent[.]").

[4] No. 04-18-00103-CV, 2019 WL 3432103, at *1 (Tex. App.—San Antonio July 31, 2019) (per curiam) (mem. op.).

[5] 628 S.W.3d 530, 533 (Tex. App.—San Antonio 2020).

[6] *Id.* at 536-39 (discussing *Lone Star Caliper Co. v. Talty Water Supply Corp.*, 102 S.W.3d 198, 200-03 (Tex. App.—Dallas 2003, pet. granted, judgm't vacated w.r.m.), and *Henderson v. Cent. Power & Light Co.*, 977 S.W.2d 439, 447 (Tex. App.—Corpus Christi 1998, pet. denied)).

[7] *Id.* at 536 (emphasis added) (quoting CenterPoint's tariff).

applied to noncustomers.[8] From the court's perspective, interchangeable use means that "each term can be substituted wherever any of the terms are used," so any narrower use within the tariff necessarily constrains the special definition to a narrower meaning throughout the tariff.[9] The court did not define the term "customer" except to state that the Ramirezes were not CenterPoint's customers.[10] The court also noted that the Ramirezes were not residents or tenants in the Castillos' home but did not explain the significance of those facts to the analysis.[11] The court posited, however, that it could not be the case that anyone using gas services inside the home would be subject to the tariff's liability limitations.[12]

After determining that the Ramirezes were not "consumers" as that term is defined in the tariff because they were not CenterPoint's "customers," the court held that the tariff's liability limitations did not apply to their negligence claims because a tariff can only govern the relationship between a utility and its customers.[13] Applying this categorical rule of nonapplicability, the court rejected CenterPoint's

---

[8] *Id.* at 536-37 (referring to the tariff's "definition of 'Consumer's Housepiping,' the requirement that the consumer provide additional information during the application process, and the required notice to the customer by CenterPoint before the customer's utility service can be terminated").

[9] *Id.* at 537.

[10] *Id.* at 536.

[11] *Id.*

[12] *Id.* at 537.

[13] *Id.* at 537-39.

6

argument that, under the tariff's plain language, the limitations on liability extend to *any* damage or loss caused by gas after it leaves the meter or escapes from the consumer's housepiping, not just a customer's damage or loss.[14] The court also ruled adversely to CenterPoint on its remaining issues challenging the submission of jury questions on negligent-undertaking and negligence per se theories and the sufficiency of the evidence to support the jury's verdict.[15]

CenterPoint filed a petition for review, which we granted to address the enforceability of the limitation of liability provisions in the natural gas provider's tariff. On that point, we agree with CenterPoint that, under the filed-rate doctrine, the liability limitation in Section 14 of the tariff plainly and expressly precludes the utility's liability for the Ramirezes' damages and applies to them as "consumers" of the utility's gas services. Accordingly, we do not reach the other issues raised in CenterPoint's petition for review.

## II. Discussion

### A. CenterPoint's Tariff

"Gas utilities are by definition monopolies in the areas they serve. As a result, the normal forces of competition that regulate prices in a free enterprise society do not operate."[16] For that reason, "[p]ublic agencies regulate utility rates, operations, and services as a substitute for competition."[17] Under the Gas Utility Regulatory Act, the Texas

---

[14] *Id.*

[15] *Id.* at 539-41.

[16] TEX. UTIL. CODE § 101.002(b).

[17] *Id.*

7

Railroad Commission is granted broad regulatory authority "to protect the public interest inherent in the rates and services of gas utilities" and "to establish a comprehensive and adequate regulatory system for gas utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the utilities."[18] To ensure utilities provide "safe, adequate, efficient, and reasonable" services,[19] the Railroad Commission can adopt reasonable rules, regulations, specifications, and standards; examine and test equipment; address complaints; ask the attorney general to apply for a court order to prohibit or enjoin violations or require compliance with the commission's rules or orders; recover civil penalties for violations; and bring an action for contempt of its lawful orders.[20]

Under this statutory scheme and associated regulations, gas utilities like CenterPoint are required to file a proposed tariff with the Railroad Commission for review and approval.[21] "A tariff is a document

---

[18] *Id.* § 101.002(a); *see id.* § 104.001(a) ("The railroad commission is vested with all the authority and power of this state to ensure compliance with the obligations of gas utilities in this subtitle."); *R.R. Comm'n v. Tex. Coast Utils. Coal.*, 357 S.W.3d 731, 740 (Tex. App.—Austin 2011) (examining the Legislature's "extraordinarily broad delegation of authority to the Commission in regard to rate regulation"), *aff'd*, 423 S.W.3d 355 (Tex. 2014).

[19] TEX. UTIL. CODE §§ 104.001(a), .251.

[20] *See id.* §§ 104.256, 105.021–.024, 105.051, 121.201–.211, 121.302–.310.

[21] *Id.* § 102.151 ("A gas utility shall file with each regulatory authority schedules showing all rates . . . ."); 16 TEX. ADMIN. CODE § 7.315 (pertaining to the filing and approval of tariffs with the Railroad Commission).

that lists a public utility's services and the rates for those services."[22] Tariffs may permissibly include provisions limiting a utility's liability for economic and personal-injury damages.[23] We have explained that "a limitation on liability is an inherent part of the rate the utility charges for its services" that allows regulated utilities to reduce costs for lower rates to customers and reflects the reality that regulated entities are "'peculiarly the subject of state control.'"[24]

Consistent with the regulatory scheme, CenterPoint filed, and the Railroad Commission approved, the tariff that was in force when the accident in this case occurred.[25] The tariff applies to "all Consumers" "[u]nless otherwise expressly stated" and except "insofar as [the tariff's rules] are changed by or are in conflict with any statute of the State of Texas, valid municipal ordinance, valid final order of any court or of the Railroad Commission of Texas, or written contract executed by Company." In the event of a conflict any "such statute, ordinance, order or contract shall control to the extent that it is applicable to the Consumer(s) in question," but "whenever possible, the[] rules shall be

---

[22] *First Assembly of God, Inc. v. Tex. Utils. Elec. Co.*, 52 S.W.3d 482, 489 (Tex. App.—Dallas 2001, no pet.) (citation omitted); 16 TEX. ADMIN. CODE § 7.315(c) (listing required contents for gas utility's filed tariff).

[23] *See Sw. Elec. Power Co v. Grant*, 73 S.W.3d 211, 219-22 (Tex. 2002) (examining a tariff provision limiting liability for personal-injury damages); *Hous. Lighting & Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668, 672-75 (Tex. 1999) (examining a tariff provision limiting liability for economic damages).

[24] *Grant*, 73 S.W.3d at 217; *Auchan*, 995 S.W.2d at 674-75 (quoting *Cole v. Pac. Tel. & Tel. Co.*, 246 P.2d 686, 688 (Cal. Dist. Ct. App. 1952)).

[25] *See* 16 TEX. ADMIN. CODE § 7.315(e). The court of appeals took judicial notice of the tariff's terms because it has the force and effect of a law. 628 S.W.3d 530, 536 (Tex. App.—San Antonio 2020).

9

construed harmoniously with such laws, contracts, ordinances, and orders." The tariff specifies that the terms "'Consumer, Customer and Applicant' are used interchangeably" and broadly defined to "mean a person or organization *utilizing services* or who wants to utilize services to CENTERPOINT[.]"[26]

CenterPoint asserts that the Ramirezes qualify as "consumers" as that term is defined in the tariff because (1) the undisputed evidence establishes they were "utilizing" CenterPoint's gas services and (2) the tariff does not limit the breadth of its reach to those who have paid or contracted for the services being utilized. CenterPoint asserts that, as "consumers," the Ramirezes would be subject to all of the tariff's provisions, including its provisions limiting the utility's liability, even absent a contractual relationship. CenterPoint faults the court of appeals for applying a definition at odds with the tariff's defined terms and notes that the court's narrow construction would make the tariff inapplicable to cohabitants such as spouses, children, roommates, and tenants who are utilizing CenterPoint's services to the same extent as the utility's direct customer. In CenterPoint's view, the tariff's special definition reflects regulatory acknowledgment that, after delivery, CenterPoint has no ability to limit gas use or consumption exclusively to the bill payer.

Even so, CenterPoint asserts that the Ramirezes' status as a "consumer" is irrelevant because the pertinent liability limitations apply without regard to the plaintiffs' status. CenterPoint cites two tariff

---

[26] Emphasis added.

10

provisions as barring the Ramirezes' negligence claims for damages, losses, or injuries caused by gas usage after the point of delivery, whether they are "consumers" under the tariff's definition or not.

First, the tariff assigns consumers the responsibility for "installing and maintaining Consumer's housepiping," meaning "[a]ll pipe and attached fittings which convey gas from the outlet side of the meter to the Consumer's connection for gas appliances." Then, in express terms, the tariff releases CenterPoint from *all liability*—without exception—in a narrow circumstance:

### 14. ESCAPING GAS

> . . . Company *shall not be liable for any damage or loss* caused by the escape of gas from Consumer's housepiping or Consumer's appliances.[27]

As CenterPoint notes, the release in Section 14 extends to "any" damage or loss emanating from a *specific source*—the consumer's housepiping or appliances. Although Section 2a of the tariff provides that "[u]nless otherwise expressly stated, these rules apply to all consumers . . . ," CenterPoint points out that Section 14 does not include language limiting its scope to damages or losses incurred by anyone in particular. For this reason, CenterPoint maintains that the liability limitation's applicability depends only on the source of the damages and Section 14 categorically bars all damages claims falling within its express terms.

The second limitation of liability more broadly precludes the utility's liability after gas leaves the "point of delivery," meaning "[t]he

---

[27] Emphasis added.

11

point where the gas is measured for delivery into Consumer's housepiping":

### 17. NON-LIABILITY

. . . .

> (b) *Company shall not be liable for any damage or injury resulting from gas or its use after such gas leaves the point of delivery* **other than** *damage caused by the Company* [1] *in the manner of installation of the service lines,* [2] *in the manner in which such service lines are repaired by the Company, and* [3] *in the negligence of the Company in maintaining its meter loop.* *All other risks after the gas left [sic] the point of delivery shall be assumed by the Consumer, his agents, servants, employees, or other persons.*[28]

Section 17, unlike Section 14, divides responsibility for risks between the utility and others, including but not limited to consumers. Unlike Section 14, however, the liability limitation in Section 17 is subject to three specific exceptions. The parties dispute the applicability of only the third exception—negligent maintenance of the meter loop—under the evidence adduced at trial.

Citing the filed-rate doctrine, CenterPoint contends the tariff provisions are presumptively reasonable and enforceable as a bar to the Ramirezes' negligence claims because they are "consumers" as that term is defined in the tariff and subject to all of its terms including the limitations of liability in Sections 14 and 17. Additionally, CenterPoint

---

[28] Emphasis added.

12

argues that the liability limits in Sections 14 and 17 expressly and plainly foreclose the Ramirezes' negligence claims against the utility regardless of their status as consumers.

## B. Filed-Rate Doctrine

The filed-rate doctrine applies here because state law has created a regulatory agency and a statutory scheme under which the regulator determines reasonable rates for the utility services CenterPoint provides.[29] Under the filed-rate doctrine, a tariff filed with and approved by a regulatory agency in accordance with the statutory scheme is presumed reasonable unless a litigant proves otherwise.[30] Once approved, "regulated utilities cannot vary a tariff's terms with individual customers, discriminate in providing services, or charge rates other than those properly filed with the appropriate regulatory authority."[31] An approved tariff carries the binding force and effect of

---

[29] *Grant*, 73 S.W.3d at 216.

[30] *Id.*

[31] *Id.* at 217. The Texas Legislature has codified the filed-rate doctrine in various provisions of the Gas Utility Regulatory Act. *See, e.g.*, TEX. UTIL CODE §§ 104.003 ("The regulatory authority shall ensure that each rate a gas utility or two or more gas utilities jointly make, demand, or receive is just and reasonable. A rate may not be unreasonably preferential, prejudicial, or discriminatory but must be sufficient, equitable, and consistent in application to each class of consumer."), .005(a) ("A gas utility may not directly or indirectly charge, demand, collect, or receive from a person a greater or lesser compensation for a service provided or to be provided by the utility than the compensation prescribed by the applicable schedule of rates filed under Section 102.151.").

law until suspended or set aside and, while in effect, defines the terms under which the utility's services are provided.[32]

Because competitive forces are absent from the regulatory environs,[33] public utilities have no power to increase rates for all customers based on losses and risks specific to an individual or a class of customers.[34] A public utility "cannot pick and choose its customers on the basis of the potential liability"[35] or "accurately estimate its exposure to damages"[36] or "efficiently insure against risks" because they are required to take all comers at fixed rates.[37] Accordingly, the regulatory body's rate-making authority encompasses the power to limit liability as an inherent part of the rate the utility charges for its

---

[32] *See Grant*, 73 S.W.3d at 217; *see also Trammell v. W. Union Tel. Co.*, 57 Cal. App. 3d 538, 550 (1976) ("[I]t is the PUC, empowered by the Legislature, and not the parties to the transaction, which by approving the tariff fixed the terms and conditions upon which a telegram message is sent. The law, not a contract between the parties, prescribes the classifications, rates and liabilities attendant thereon.").

[33] TEX. UTIL. CODE § 101.002(b) (recognizing that, due to governmental regulation of gas utilities, "the normal forces of competition that regulate prices in a free enterprise society do not operate"); *Grant*, 73 S.W.3d at 215 (observing that then-extant regulatory authority governing electric utilities was "a substitute for competitive forces").

[34] *Grant*, 73 S.W.3d at 221.

[35] *Hous. Lighting & Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668, 674 (Tex. 1999) (noting that a utility must provide nondiscriminatory service to all customers within its area).

[36] *Grant*, 73 S.W.3d at 217.

[37] *Id.*

services.[38] We have held that tariff provisions limiting the types of damages for which a utility will be liable should be enforced as written and that claims for damages other than those provided by the tariff will be foreclosed.[39] Such provisions, whether limiting liability for economic losses or personal-injury damages, are presumptively reasonable.[40]

In *Southwestern Electric Power Co. v. Grant*, we held, as a matter of first impression, that a provision in a tariff limiting an electric utility's liability for personal-injury damages was reasonable as a matter of law and enforceable against a customer's ordinary negligence claim.[41] In so holding, we observed that the limitation was narrowly drawn in that it applied to a specific set of circumstances and did not broadly immunize the utility from personal-injury claims arising from its negligence.[42] By way of example, we noted that "the tariff provision would not shield [the utility] from liability if an employee, in the performance of his or her duties, injures a person while driving to a job."[43] The tariff did not violate public policy, we said, "because it [did] not purport to relieve [the

---

[38] *Id.*; *see Sw. Sugar & Molasses Co. v. River Terminals Corp.*, 360 U.S. 411, 417-18 (1959) (declining to strike down an exculpatory provision in an approved tariff that relieved a towboat owner of liability for its own negligence in towing barges because tariff provisions limiting liability are part and parcel of the rates charged and the regulator may have had a sound basis for approving such a clause).

[39] *Auchan*, 995 S.W.2d at 672.

[40] *Grant*, 73 S.W.3d at 222; *Auchan*, 995 S.W.2d at 675.

[41] *Grant*, 73 S.W.3d at 214.

[42] *Id.* at 220.

[43] *Id.*

15

utility] from liability under all conceivable circumstances."[44] Moreover, the provision expressly provided a remedy for damages caused by the utility's gross negligence or willful misconduct.[45]

Our conclusion that a tariff can limit a utility's liability for personal-injury damages was further informed by factors we had previously considered in upholding a tariff limiting liability for economic damages.[46] We noted that many of the same factors that supported the reasonableness of a limitation on economic damages also applied in personal-injury cases.[47] Among the most significant were that (1) a regulated utility's inability to raise rates for incurred liability "could have a direct detrimental effect on its finances"; (2) the requirement of nondiscriminatory service means the utility cannot refuse service to customers who have a greater potential for suffering losses; and (3) extensive regulation of the utility industry afforded consumers protection through regulations providing remedies to consumers and penalizing utilities for unsafe or inadequate service.[48]

Although *Grant* involved an electric utility rather than a gas utility, the same factors apply in this context.[49] Once rates are set, the

---

[44] *Id.*

[45] *Id.*

[46] *Id.* at 220-21.

[47] *Id.*

[48] *Id.*

[49] In 1999, the Legislature deregulated the electricity-generation market and permitted certain electricity providers to compete for customers. The tariff at issue in *Grant* was governed by the pre-1999 regulatory scheme. *Id.* at 216.

16

utility has no power to vary those rates to account for catastrophic loss and potential financial distress. Absent liability limitations, utility customers would be subjected to higher utility rates for essential services, and the financial stability of service providers would be imperiled.[50] Our regulatory scheme protects the public's strong interest in the financial integrity and effective functioning of public utilities that provide critical services.

The Ramirezes do not challenge the tariff's validity or the Railroad Commission's authority to approve the liability limitations contained therein. Nor do they contend that the relevant liability limitations are unreasonable.[51] Rather, they assert that the tariff's provisions cannot be construed as binding on a litigant who lacked a contractual relationship with the utility. Alternatively, if the tariff's provisions can be so construed, the Ramirezes argue that the release of liability conflicts with a local building ordinance that requires open gas valves to be plugged "gas tight" before gas to a dwelling is turned on.

---

[50] *See Hous. Lighting & Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668, 675 (Tex. 1999) ("The public interest in protecting the financial integrity of public utilities is another basis for concluding that tariff provisions such as the one at issue in this case are not unreasonable when applied to claims for ordinary negligence."); *see also Grant*, 73 S.W.3d at 221 (observing that "a utility's liability exposure could have a direct detrimental effect on its finances").

[51] Unlike the tariff in *Grant*, the liability limits in CenterPoint's tariff do not expressly except gross negligence or willful misconduct, but no such claims are at issue here, and we are not asked to consider the enforceability of the tariff's liability limitations in such circumstances. *See Auchan*, 995 S.W.2d at 675 (expressing no opinion as to whether a tariff may limit liability for gross negligence or willful misconduct because the plaintiff had abandoned its gross-negligence claim).

The Ramirezes take the position that this asserted conflict renders the tariff's liability limitations inoperative under the tariff's directive pertaining to conflicts with other law. Finally, the Ramirezes argue the Open Courts Provision in the Texas Constitution precludes enforcement of the tariff's limitations of liability.

We hold that the Ramirezes come within the tariff's broad definition of a "consumer" and Section 14 plainly bars their negligence claims. Accordingly, we do not reach the question of Section 17's applicability or determine whether either liability limitation applies without regard to the Ramirezes "consumer" status.

### 1. The Ramirezes are "Consumers" under the Tariff

The tariff broadly defines the terms "Consumer, Customer and Applicant" as applying to "a person or organization *utilizing* services or who wants to utilize services to CenterPoint Energy Entex."[52] The tariff does not define the word "utilizing," and no technical meaning is indicated or asserted by the parties. Commonly understood, "utilize" simply means to "make use of,"[53] "to put to use,"[54] and to "make practical and effective use of."[55] The trial testimony reflects that the Ramirezes

---

[52] Emphasis added.

[53] WEBSTER'S NEW COLLEGIATE DICTIONARY (1980); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002).

[54] WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2016); WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (1996).

[55] NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010).

18

actively made use of the gas services CenterPoint provided to the Castillo residence.

Mrs. Ramirez testified that, as the Castillos' houseguest, she used hot water from gas water heaters to wash dishes and clean clothes and occasionally cooked meals on the gas stove. Mr. Ramirez similarly testified that he ate meals prepared by his wife, who would cook in the Castillos' kitchen using the gas stove. He also conceded that he took gas-heated showers. In routinely cooking, cleaning, eating, and bathing—even on a temporary basis—the Ramirezes made use of the gas services CenterPoint provided and, accordingly, were "consumers" under the tariff's definition of the term.

The court of appeals concluded otherwise, but the analysis is somewhat hazy. We discern two possible rationales for the court's refusal to apply the tariff's definition as written: (1) "the Ramirezes were visiting the Castillos and were not residents or tenants of their home"[56] and (2) "the tariff provides the terms consumer, customer, and applicant are used interchangeably," which necessarily means that "each term can be substituted wherever any of the terms are used," yet "the tariff contains various references to these terms where extending the term to non-customers would be absurd."[57] Neither of these rationales supports the conclusion that the definition the tariff provides is actually narrower than it purports to be.

---

[56] 628 S.W.3d 530, 536 (Tex. App.—San Antonio 2020).

[57] *Id.* at 537.

19

The first rationale engrafts textually unsupportable constraints. The tariff does not limit the term "consumer" to residents, tenants, or even those who have paid or contracted for services. While residents and tenants fall within the broad definition, so too do visitors making active use of the gas services, as the Ramirezes were. The tariff does not specify a class of consumers that would exclude the Ramirezes, but instead encompasses all persons "utilizing" CenterPoint's services.

The court's second rationale effectively writes out the tariff's definition and substitutes the ordinary meaning of the word "customer" based on an asserted absurdity that would purportedly ensue from applying the definition the tariff supplies.[58] The court of appeals pointed to "the definition of 'Consumer's Housepiping,' the requirement that the consumer provide additional information during the application process, and the required notice to the customer by CenterPoint before the customer's utility service can be terminated" as provisions that could not reasonably be applied to noncustomers.[59] From this conclusion, the court deduced that the tariff's stated definition does not mean what it plainly says.[60] The court's analysis proves too much.

Isolated provisions in the tariff would, as a practical matter, apply only to those who are CenterPoint's customers or applicants as opposed

---

[58] The ordinary meaning of "customer" is "a person who purchases goods or services from another; buyer; patron . . . a person one has to deal with." WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (1996). Consistent with part of the tariff's definition, an "applicant" is "a person who applies for or requests something." *Id.*

[59] 628 S.W.3d at 537.

[60] *Id.*

to those who are simply "utilizing" CenterPoint's services. But applying the tariff's definition produces no absurdity in these contexts because none of the cited uses is inconsistent with the supplied definition. Rather, each such use is subsumed within that definition and either reasonably applies to a subclass of covered persons or could reasonably extend to noncustomers.[61] Incidental use of defined terms in a narrower fashion does not mean that, contrary to their otherwise expansive definition, the terms actually carry a narrower meaning throughout the tariff.[62]

It would be useless—and unnecessary—for the tariff to provide a specific definition if the terms were intended to carry only their ordinary meanings. And it would be useless—and unnecessary—to make the tariff applicable to "consumers" if the tariff was intended only to bind "customers" and "applicants" as those terms are ordinarily understood. Because it is possible to do so, we must construe the tariff to give effect

---

[61] For example, a person "utilizing" gas services could reasonably be responsible for "installing and maintaining Consumer's housepiping" even though such person is not the utility's customer, like a resident, tenant, or homeowner. It is not absurd for the tariff's definition of "consumer" to encompass such a noncustomer. Likewise, the requirement that a "consumer" provide information during the application process invokes the second portion of the tariff's definition, referring to a person "who wants to utilize services," meaning only a *prospective* customer. Here, too, there is nothing unreasonable about extending the defined term "consumer" to such a noncustomer. Nor does the requirement that notice be given to a "customer" before terminating utility services alter the tariff's definition because the narrower use is not repugnant to it. The fact that a narrower meaning might apply in some instances does not mean that it applies in all instances.

[62] *See FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 64 (Tex. 2014) (construing contract language).

21

to all of its terms so that none is rendered meaningless.[63]  The court of appeals erred in construing the term "consumer" as bearing the ordinary meaning of the term "customer" because doing so renders the former surplusage and nullifies the tariff's stated definition.

Because the evidence conclusively establishes that the Ramirezes actually utilized CenterPoint's services, they are "consumers" even though they neither paid nor contracted for those services and generally would not be considered to be CenterPoint's customers under the ordinary meaning of that term.  Rather than giving rise to an absurdity, the breadth of the tariff's definition accords with a practical understanding that a gas utility's rate-regulated services may be "utilized" by someone other than the person whose name is on the utility bill.

### 2. Section 14's Limitation of Liability Applies

The Ramirezes' injuries fall within the express scope of the limitation of liability in Section 14 because it is undisputed that the gas leak at the Castillo residence occurred after the point of delivery from a leak in the housepiping at the unused connections for gas appliances in the laundry room.  The Ramirezes nonetheless argue that Section 14 cannot be applied as written because Texas law provides that a tariff governs only the relationship between the utility and a customer, as that

---

[63] *See TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016) (construing "the statute as a whole [and] giving effect to each provision so that none is rendered meaningless or mere surplusage"); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.").

term is commonly understood. The court of appeals agreed. Although acknowledging that this Court had not directly addressed the issue, the appeals court cited statements in our precedent to the effect that a tariff governs the relationship between a utility and its *customers* and prohibits *customers* from suing the utility over issues the tariff's terms govern.[64] The court also relied on opinions from two sister courts, *Lone Star Caliper Co. v. Talty Water Supply Corp.*[65] and *Henderson v. Central Power & Light Co.*,[66] both of which declined to enforce tariffs against noncustomers.[67]

The court of appeals erred in treating the tariff as if it were a private contract between CenterPoint and its customers. A public utility's tariff has "the force and effect of law" and is not "a mere contract."[68] By approving the tariff, the regulatory agency—not the parties to the transaction—fixed the terms and conditions under which the utility's services are provided.[69] "The law, not a contract between

---

[64] 628 S.W.3d 530, 537 (Tex. App.—San Antonio 2020) (referring to *Sw. Elec. Power Co v. Grant*, 73 S.W.3d 211, 217, 222 (Tex. 2002), and *City of Richardson v. Oncor Elec. Delivery Co. LLC*, 539 S.W.3d 252, 254 (Tex. 2018)).

[65] 102 S.W.3d 198, 202-03 (Tex. App.—Dallas 2003, pet. granted, judgm't vacated w.r.m.).

[66] 977 S.W.2d 439, 447 (Tex. App.—Corpus Christi 1998, pet. denied).

[67] 628 S.W.3d 530, 537-39 (Tex. App.—San Antonio 2020).

[68] *Grant*, 73 S.W.3d at 217, 222; *see, e.g.*, *W. Union Tel. Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 572 (1921) (explaining that an approved tariff governs the utility's services "not as . . . a matter of contract, . . . but [as] a matter of law"); *City of Richardson*, 539 S.W.3d at 263.

[69] *W. Union*, 256 U.S. at 571; *Trammell v. W. Union Tel. Co.*, 57 Cal. App. 3d 538, 550 (1976).

23

the parties, prescribes the classifications, rates *and liabilities attendant thereon*,"[70] and it is axiomatic that laws apply to those who fall within their ambit regardless of assent or even knowledge.[71] Accordingly, the absence of either knowledge or consent on the Ramirezes' part does not preclude enforcement of the tariff according to its plain terms.[72]

The court of appeals misread our precedent as imposing such a constraint. While it is accurate to say that we have held that a tariff is binding on a customer, we have never held that it is not binding on a noncustomer notwithstanding tariff language that makes it so. The cases of this Court that were referenced in the court of appeals' opinion involved the tort claims of customers, and our statements to the effect that a tariff governs the relationship and liability between a utility and a customer are but a truism, not a rule of limitation.

The court of appeals' opinions in *Lone Star Caliper* and *Henderson* might be distinguishable on the terms of the tariffs at issue there except for the breadth of the language used in those opinions. That is arguably the case in *Henderson*, in which the tariff expressly limited the indemnity and release clause to the "customer" and did not provide a special definition of that term.[73] But rather than relying solely on the

---

[70] *Trammell*, 57 Cal. App. 3d at 550 (emphasis added).

[71] *W. Union*, 256 U.S. at 569, 571-73.

[72] *Id.* at 572.

[73] 977 S.W.2d 439, 447 (Tex. App.—Corpus Christi 1998, pet. denied) (holding that the plaintiffs were "consumers" for purposes of the Texas Deceptive Trade Practices Act but not "customers" of electricity to which the tariff's release and indemnity provision applied under the ordinary meaning of that term).

ordinary meaning of the tariff's terms, the court's opinion, as written, could be construed more expansively. *Lone Star Caliper* also seems to apply an absolute rule of nonenforceability under a contract theory of enforcement.[74] To the extent those cases conflict with our decision today, we disapprove them.

We hold that the tariff's liability limitation in Section 14 is enforceable against the Ramirezes' negligence claims. This result derives not only from the tariff's plain language but also accords with our precedent and the economic reality that public utilities do not operate in the same environment as unregulated businesses. In *Auchan*, we observed that

> "a public utility, being strictly regulated in all operations with considerable curtailment of its rights and privileges shall likewise be regulated and limited as to its liabilities. In consideration of its being peculiarly the subject of state control, 'its liability is and should be defined and limited.' There is nothing harsh or inequitable in upholding such a limitation of liability when it is thus considered that the rates as fixed by the Commission are established with the rule of limitation in mind."[75]

As a regulated entity, CenterPoint has no ability to limit who may use its services and no control over who a paying customer allows to use its services—whether it is the customer's roommate, significant other, or a

---

[74] 102 S.W.3d 198, 202-03 (Tex. App.—Dallas 2003, pet. granted, judgm't vacated w.r.m.) ("In order to enforce the terms of the tariff against Lone Star, Talty must first establish that Lone Star is one of its customers. This is an essential element of the affirmative defense.").

[75] *Hous. Lighting & Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668, 674-75 (Tex. 1999) (quoting *Cole v. Pac. Tel. & Tel. Co.*, 246 P.2d 686, 688 (Cal. Dist. Ct. App. 1952)).

hundred guests at a party. As we explained in *Grant*, tariff provisions limiting a utility's liability enable utilities to provide vital services in an effective, consistent, nondiscriminatory, and cost-efficient manner.[76] Without a limitation of liability, the potential for substantial damages awards either threatens the financial integrity of the utility or must be passed on with regulatory approval to all rate payers. Those consequences ensue whether the tort claims come from the bill payer or the bill payer's cohabitants and guests.

Other jurisdictions have similarly concluded that a tariff's liability limitations may extend to noncustomers because tariffs have the force and effect of law and liability limitations are an inherent part of the filed rate.[77] While some courts have held that limitations of

---

[76] 73 S.W.3d 211, 217, 221-22 (Tex. 2002); *see L.A. Cellular Tel. Co. v. Superior Ct. of L.A. Cnty.*, 76 Cal. Rptr. 2d 894, 897 (Cal. Ct. App. 1998) (enforcing a tariff to preclude personal-injury claims and recognizing the existence of "an equitable trade-off—the power to regulate rates and to set them below the amount an unregulated provider might otherwise charge requires a concomitant limitation on liability").

[77] *See Leo v. Nationstar Mortg. LLC*, 964 F.3d 213, 217 & n.4 (3d Cir. 2020) (holding that the filed-rate doctrine applied even though the party suing did not pay the premium on the underlying tariff); *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1322 (11th Cir. 2018) ("An important, though heretofore overlooked, corollary of the nondiscrimination and nonjusticiability principles is that the filed-rate doctrine's applicability does not turn on whether the plaintiff is a rate-payer. . . . Even non-customers, for instance, cannot directly challenge a filed rate."); *U.S. Airways, Inc. v. Qwest Corp.*, 361 P.3d 942, 946-49 (Ariz. Ct. App. 2015) (holding that a tariff's limitation of liability extended to a noncustomer's claims), *aff'd in relevant part & depublished in nonrelevant part*, 385 P.3d 412 (Ariz. 2016) (per curiam); *Colich & Sons v. Pac. Bell*, 244 Cal. Rptr. 714, 718 (Ct. App. 1988) (holding that a tariff's limitation of liability provision is binding on the public generally because such a provision is an inherent part of the utility's established rates and has the force and effect of law); *Trammell v. W. Union Tel. Co.*, 57 Cal.

liability are not enforceable as to noncustomers or as to personal-injury claims of customers, those cases are distinguishable because they involve different tariff language,[78] challenges to the scope of regulatory authority,[79] or an explicit repudiation of the precedent of this Court.[80]

---

App. 3d 538, 551, 553 (1976) ("As the tariff and the limitation of liability provisions have the force and effect of law, they are binding on the public generally and necessarily on the recipient of the telegram."); *cf. Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 259 (2d Cir. 2015) ("[A] claim challenging a regulator-approved rate is subject to the filed rate doctrine whether or not the rate is passed through an intermediary.  The claim is therefore barred if it would undermine the regulator's rate-setting authority . . . .").

[78] *See Marriott Corp. v. Chesapeake & Potomac Tel. Co.*, 723 A.2d 454, 461 (Md. Ct. Spec. App. 1998) ("Reading Tariff No. 201 narrowly, as we must, we are convinced that the Tariff applies only to C & P's direct customers."); *Vendola v. S. Bell Tel. & Tel. Co.*, 474 So. 2d 275, 278 (Fla. Dist. Ct. App. 1985) ("The tariff will not yield to the construction contended for by Southern Bell."); *Abel Holding Co., Inc. v. Am. Dist. Tel. Co.*, 371 A.2d 111, 114-15 (N.J. Sup. Ct. App. Div. 1977) ("[W]here, as here, the plain language of the limitation of liability clause does not specifically apply to the situation involved, it will not be construed or applied so as to limit the right of one not a party to the contract to recover against one who is a party to the contract for the latter's tortious conduct.").

[79] *Tyus v. Indianapolis Power & Light Co.*, 134 N.E.3d 389, 406-08 (Ind. Ct. App. 2019) (holding that a tariff limiting liability for personal injuries to noncustomers was *ultra vires* and void because the legislature did not give, or intend to give, the regulatory agency the power to shield a public utility from liability caused by the utility's negligence to noncustomers), *transfer denied,* 160 N.E.3d 512 (Ind. 2020).

[80] *See Pub. Serv. Comm'n v. Mo. Gas Energy*, 388 S.W.3d 221, 231 & n.8 (Mo. Ct. App. 2012) (expressly disagreeing with *Grant* and other states in holding that the Missouri Public Service Commission could not "abrogate a customer's right to sue a public utility company for negligence involving personal injury or property damage").

### 3. No Conflict with Local Ordinances

In the alternative, the Ramirezes contend that the tariff cannot be enforced as written because it must yield to a conflicting local building code ordinance applicable to "turning gas on." The ordinance adopts and incorporates the International Residential Code, which mandates that "[b]efore any system of piping is put in service or concealed, it shall be tested to ensure that it is gas tight"; "[d]uring the process of turning gas on into a system of new gas piping, the entire system shall be inspected to determine that there are no open fittings or ends and that all valves at unused outlets are closed and plugged or capped"; and subject to certain exceptions, "[g]as outlets that do not connect to appliances shall be capped gas tight."[81]

The local ordinance does not conflict with the tariff's limitation of liability.[82] Even if the ordinance created a private cause of action, which

---

[81] *See* City of Laredo, Tex., Code of Ordinances §§ 7-1, 7-7. 25-3, 25-6 (adopting the International Residential Code) (1985) (available at https://library.municode.com/TX/laredo/codes/code_of_ordinances?nodeId=PTI ICOOR_CH7BUBURE); INT'L RESIDENTIAL CODE §§ G2415.13, G2415.17, G2417.6.2.

[82] *Cf. Del Carmen Canas v. CenterPoint Energy Res. Corp.*, 418 S.W.3d 312, 315-16, 323 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (Frost, C.J., concurring in part) (holding that enforcement of the limitation of liability in Section 14 of CenterPoint's tariff did not conflict with, or relieve CenterPoint of the obligation to comply with, federal regulations imposing a duty to provide natural gas that is readily detectible to a person with a normal sense of smell); *id.* at 333-34 (Christopher, J., concurring in part) (explaining that none of the federal regulations the plaintiff relied on conflicted with the limitation of liability provision in Section 14 and, to the extent the regulations imposed a duty, the tariff did not relieve CenterPoint of its obligation to comply with the regulatory scheme, which remained enforceable through statutory remedies and enforcement mechanisms that afford protection to the public).

CenterPoint disputes, that cause of action would not give rise to a conflict. A liability limitation only comes into play if the utility could be liable for violating some duty or obligation imposed by law or contract. An ordinance imposing a duty is not inconsistent with a tariff provision limiting liability for damages; to the contrary, they are correlated with one another. Both can be given effect even though the result is a bar to any liability flowing from breach of any duty the ordinance imposes.[83]

### 4. No Open Courts Violation

Nor does enforcement of the tariff violate the Texas Constitution's mandate that "[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."[84] This provision "includes at least three separate constitutional guarantees: 1) courts must actually be operating and available; 2) the Legislature cannot impede access to the courts through unreasonable financial barriers, and 3) meaningful remedies must be afforded."[85] The Ramirezes' cursory open-courts argument suggests that enforcement of the tariff's provisions limiting liability would

---

[83] *Cf. BCCA Appeal Grp., Inc. v. City of Hous.*, 496 S.W.3d 1, 7 (Tex. 2016) ("[A] general law and a city ordinance will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached."). We also note that the local building ordinances include their own enforcement mechanism for the public's protection that are unaffected by any limitation of CenterPoint's liability in a private cause of action. *See* City of Laredo, Tex., Code of Ordinances § 1-6 (governing general penalties and continuing violations) (1985) (available at https://library.municode.com/TX/laredo/codes/code_of_ordinances?nodeId=PTIICOOR_CH7BUBURE).

[84] TEX. CONST. art. I, § 13.

[85] *Trinity River Auth. v. URS Consultants, Inc.-Tex.*, 889 S.W.2d 259, 261 (Tex. 1994).

contravene the third guarantee, which precludes the Legislature from "abrogat[ing] the right to assert a well-established common law cause of action unless the reason for [the Legislature's] action outweighs the litigants' constitutional right of redress."[86]   A litigant challenging legislative action on open-courts grounds must show that (1) "the litigant has a cognizable common law cause of action that is being restricted" and (2) "the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute."[87]

Assuming the open-courts provision is implicated here, enforcement of the limitation of liability in Section 14 does not infringe the Ramirezes' constitutional rights.  The tariff does not withdraw all remedies or avenues of redress[88] or make a remedy by due course of law contingent on an impossible condition.[89]   Section 14 of the tariff is narrow, does not (and did not) preclude the Ramirezes from seeking a remedy as against other parties for their indivisible injuries, and for the reasons articulated above, is not unreasonable or arbitrary when balanced against its purposes.

---

[86] *Id.* (quoting *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 448 (Tex. 1993)).

[87] *Id.* at 262.

[88] *See Travelers Indem. Co. v. Fuller*, 892 S.W.2d 848, 853 (Tex. 1995) (recognizing that the open-courts provision generally "restricts the legislature's ability to withdraw all legal remedies from one having a cause of action well established and well defined in the common law").

[89] *See Nelson v. Krusen*, 678 S.W.2d 918, 921-23 (Tex. 1984) (discussing circumstances under which impossible conditions preclude meaningful access to the courts and holding that, as applied, an Insurance Code provision establishing a two-year limitations period for medical maltreatment violated the open-courts provision).

### III. Conclusion

CenterPoint is entitled to judgment as a matter of law because (1) the limitation of liability in its filed and approved tariff is reasonable, enforceable, and binding under the filed-rate doctrine and (2) the tariff plainly bars the utility's liability for ordinary negligence as alleged by the plaintiffs in this case. We therefore reverse the court of appeals' contrary judgment and render judgment for CenterPoint.

John P. Devine
Justice

**OPINION DELIVERED:** February 11, 2022